IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT PIOTROWSKI

:

:

v.                          :   Civil Action No. DKC 11-3758

:

WELLS FARGO BANK, N.A.

:

**MEMORANDUM OPINION**

Presently pending and ready for review in this mortgage loan modification case is the motion to dismiss filed by Defendant Wells Fargo Bank, N.A. ("Wells Fargo"). (ECF No. 10). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part.

**I.   Background**

**A.   Factual Background**

The following facts are alleged in the complaint filed by Plaintiff Robert Piotrowski, as supplemented by the information contained in documents attached to Wells Fargo's motion to dismiss.[1]  Mr. Piotrowski is a Maryland resident who purports to

---

[1] "[W]hen a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'"  *Am. Chiropractic Ass'n v. Trigon*

represent a class of homeowners who have been damaged by Wells Fargo's alleged failures to comply with applicable federal and state law in connection with their mortgage loan modification requests.

On or about January 31, 2007, Mr. Piotrowski purchased the property located at 10916 Citreon Court, North Potomac, Maryland, 20878 ("the Property") with the proceeds of a mortgage loan.  In connection with this purchase, Mr. Piotrowski and his wife signed two purchase money deeds of trust as "Borrower[s]." (ECF No. 11-1).[2]  Paragraph 22 of the primary deed of trust, provides, in relevant part, as follows:

---

*Healthcare, Inc*., 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l, Inc*., 190 F.3d 609, 618 (4th Cir. 1999)). It is also appropriate to take judicial notice of — and consequently consider — matters of public record in deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6).  *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  Wells Fargo attaches a number of documents to its motion to dismiss, including (1) two recorded purchase money deeds of trust for the Property signed by Mr. Piotrowski and his wife (ECF No. 11-1); (2) a "Special Forbearance Agreement" signed by the Piotrowskis (ECF No. 11-3); and (3) a letter from Wells Fargo to the Piotrowskis dated May 15, 2011 (ECF No. 11-4).  Because each of these documents is either expressly relied on in the complaint or is a matter of public record – and because Mr. Piotrowski does not dispute their authenticity – the exhibits can be considered without converting the motion into one for summary judgment.

[2] The deeds of trust submitted by Wells Fargo identify Mr. Piotrowski's wife as "Iwona Piotrowska."  (*See* ECF No. 11-1). In their briefs, however, both parties refer to Mr. Piotrowski's wife as "Iwona Piotrowski" and to the couple as the "Piotrowskis."

22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. . . . If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale, assent to decree, and/or any other remedies permitted by Applicable Law.

(*Id.* at 10).

In December 2010, the Piotrowskis suffered a reduction in household income.  In January 2011, at a time when the Piotrowskis were current on their mortgage loan, Mr. Piotrowski submitted a completed loan modification application to Wells Fargo, the servicer of their mortgage loan ("the First Modification Request").  Specifically, Mr. Piotrowski requested that his monthly mortgage payment be adjusted downward to 31% of his total pretax monthly income.  On January 26, an unnamed Wells Fargo representative confirmed to Mr. Piotrowski *via* telephone that the servicer had received all of the documentation it needed and that "the package had been approved by the processor."  (ECF No. 1 ¶ 24).

On February 7, 2011, Wells Fargo informed Mr. Piotrowski that he was approved for a "Special Forbearance Agreement." Pursuant to this Agreement, Mr. Piotrowski would pay a reduced mortgage payment of $1,657.79 for the months of March, April, and May 2011, during which time Wells Fargo promised that he would be considered for "a modification of his loan as he had applied." (*Id.* ¶ 28). Paragraphs 2-4 of the Special Forbearance Agreement state as follows:

> 2. This Agreement temporarily accepts reduced payments or maintains regular monthly payments as outlined in section 5 below. Upon successful completion of the Agreement, your loan will not be contractually current. Since the payments may be less than the total amount due you may still have outstanding payments and fees. Any outstanding payments and fees will be reviewed for a loan modification. If approved for a loan modification, based on investor guidelines, this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement. An additional payment may be required.
>
> 3. The lender is under no obligation to enter into any further agreement, and this Agreement shall not constitute a waiver of the lender's right to insist upon strict performance in the future.
>
> 4. All of the provisions of the Note and Security Instrument, except as herein provided, shall remain in full force and effect. Any breach of any provision of this Agreement or non-compliance with this Agreement, shall render the Agreement null and void. The lender, in its sole discretion and without further notice to

> you, may terminate this Agreement.  If the
> Agreement is terminated, the lender may
> institute foreclosure proceedings according
> to the terms of the Note and Security
> Instrument.  In the event of foreclosure,
> you may incur additional expenses of
> attorney's fees and foreclosure costs.

(ECF No. 11-3).  The Piotrowskis accepted the Special Forbearance Agreement on February 18, 2011, and made each of the three payments in advance of the stated due date.

On April 25, 2011, Shona Sanders, a processor with Wells Fargo, requested that Mr. Piotrowski re-apply for a loan modification by submitting certain documentation.  The next day, April 26, Mr. Piotrowski sent all of the documents requested by Sanders in support of his second request to adjust his monthly mortgage payment to 31% of his then pretax monthly income ("the Second Modification Request").

Mr. Piotrowski never received any notice from Wells Fargo that it had denied his Second Modification Request.  Yet on May 15, 2011, Wells Fargo sent a letter to the Piotrowskis ("the Notice of Default") stating that "[o]ur records indicate that your loan is in default for failure to make payments due." (ECF No. 11-4).  The Notice of Default stated that the Piotrowskis' total delinquency, as of May 15, 2011, was $3,926.04, and further advised that "[u]nless the payments on your loan can be brought current by June 29, 2011, it will become necessary to require immediate payment in full (also called acceleration) of

your Mortgage Note and pursue the remedies provided for in your Mortgage or Deed of Trust, which include foreclosure." (*Id.*). Mr. Piotrowski avers that the sum of $3,926.04 "represented the difference between his regular payment and the Special Forbearance Agreement payments." (ECF No. 1, at 10 ¶ 34).[3]   On May 26, 2011, Mr. Piotrowski "made the cure payment" of $3,926.04.  On May 25, 2011, allegedly "after again bringing his loan current," Mr. Piotrowski submitted another completed loan modification application requesting that his monthly mortgage payment be adjusted downwards ("the Third Modification Request"). (*Id.* at 10 ¶ 29).[4]

On June 20, 2011, a Wells Fargo representative named Tony informed Mr. Piotrowski *via* telephone that Wells Fargo would be assessing his account with late fees of $128.43 "as a result of the Special Forbearance Agreement it had offered him and he agreed to." (*Id.* at 11 ¶ 30).  Piotrowski promptly paid the

---

[3] In ordering its paragraphs, the complaint repeats numbers 29-34.  For ease of reference, where this Memorandum Opinion cites to a paragraph number that was repeated in the complaint, it will be identified by both paragraph number and page number.

[4] The complaint asserts inconsistent allegations regarding the timing of Mr. Piotrowski's cure payment and the Third Modification Request.  The explicit allegations state that Mr. Piotrowski submitted the Third Modification Request on May 25, 2011, one day before submitting the cure payment on May 26. (ECF No. 1, at 10 ¶¶ 34, 29).  The complaint also alleges, however, that Mr. Piotrowski submitted his Third Modification request "*after* again bringing his loan current." (*Id.* at 10 ¶ 29) (emphasis added).

$128.43 "out of fear that if he did not, Wells Fargo would wrongfully assess him further fees or even threaten foreclosure again for no bona fide reason." (*Id.*).

In connection with his Third Modification Request, Mr. Piotrowski sent additional documents requested by Wells Fargo *via* facsimile to the attention of Wells Fargo representative Dee Dee Greenwall on July 6 and again on July 25. During the next two weeks, Mr. Piotrowski left messages for Ms. Greenwall and other unnamed Wells Fargo representatives on at least seven occasions without receiving any response. On August 11, 2011, an unnamed Wells Fargo representative informed Mr. Piotrowski (1) that Wells Fargo had all the information necessary to consider the Third Modification Request; (2) that the Third Modification Request "had been forwarded to the underwriters for review"; and (3) that it would take the underwriting department about three to four weeks to review. (ECF No. 1, at 12 ¶ 32).

After Mr. Piotrowski left another message inquiring about his Third Modification Request, Ms. Greenwall contacted Mr. Piotrowski on September 15, 2011, and "promised him an update by September 19, 2011." (*Id.* ¶ 33). No such update was ever provided. Indeed, despite several additional requests for updates, Wells Fargo never provided Mr. Piotrowski with any written response to, or denial of, the Third Modification Request.

Mr. Piotrowski alleges that, as a result of Well Fargo's alleged "direct and indirect actions," including "through the improper threat of an imminent foreclosure action against the Property" and "the assessment of unfair and deceptive late fees and costs to his accounts," he has (1) suffered damage to his credit; (2) incurred legal fees and expenses; (3) lost time from work in attempting to resolve the dispute without litigation; and (4) suffered emotional damages "manifested by severe insomnia, sleeplessness, worry, and an[x]iety." (*Id.* ¶ 37).

**B.   Procedural Background**

On December 29, 2011, Piotrowski filed a four-count class action complaint on behalf of himself and similarly situated borrowers against Wells Fargo, asserting claims under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(d) ("ECOA"); the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law § 14-201 *et seq.* ("MCDCA"); the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 *et seq.* ("MCPA"); and the Maryland Mortgage Fraud Protection Act, Md. Code Ann., Real Prop. § 7-401 *et seq.* ("MMFPA").  (ECF No. 1 ¶¶ 56-106).  On March 2, 2012, Wells Fargo moved to dismiss the complaint for failure to join a necessary party pursuant to Fed.R.Civ.P. 12(b)(7) and for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).  (ECF Nos. 10 & 11).  Piotrowski filed an opposition (ECF No. 14), and Wells Fargo replied (ECF No. 17).

## II.   Motion to Dismiss Pursuant to Rule 12(b)(7)

### A.   Standard of Review

Rule 12(b)(7) authorizes a motion to dismiss for failure to join a party to the original action under Rule 19 "when there is an absent person without whom complete relief cannot be granted or whose interest in the dispute is such that to proceed in his absence might prejudice him or the parties already before the court."   5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1359 (2d ed. 1990).   In assessing a Rule 12(b)(7) motion, first it must be determined "'whether [the absent] party is necessary to a proceeding because of its relationship to the matter under consideration pursuant to Rule 19(a)."   *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999).   "If a party is necessary, it will be ordered into the action," so long as joinder does not destroy the court's jurisdiction.   *Id.*   When joinder is infeasible, it must be determined "whether the proceeding can continue in [the party's] absence, or whether [the party] is indispensable pursuant to Rule 19(b) and the action must be dismissed."   *Id.*

### B.   Analysis

In its motion, Wells Fargo argues that Mr. Piotrowski's complaint must be dismissed because he failed to join his wife, Iwona Pitorwoski, as a party.   Wells Fargo notes that both deeds of trust and the Special Forbearance Agreement "reflect

that Mrs. Piotrowski was a co-borrower on the [mortgage loan in question]," such that complete relief cannot be afforded in her absence. (ECF No. 11, at 7-8). In his opposition, Mr. Piotrowski contends that Mrs. Piotrowski is not a necessary party because, pursuant to the doctrine of collateral estoppel, this court's factual and legal conclusions would bind her in any subsequent proceedings. (ECF No. 14, at 12). Nonetheless, Mr. Piotrowski represents that Mrs. Piotrowski is willing to be added as an additional named plaintiff. In light of this representation, leave to amend will be granted so that Mr. Piotrowski can join Mrs. Piotrowski as an additional plaintiff, and the question of whether she is a necessary or indispensable party under Rule 19 will not be reached.

## III. Motion to Dismiss Pursuant to Rule 12(b)(6)

### A.   Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n. 3 (2007). That showing must

10

consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).   In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).   Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"   *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).   Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task

11

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Allegations of fraud are subject to a heightened pleading standard under Rule 9(b). *Harrison*, 176 F.3d at 783-84. Rule 9(b) states that "in alleging a fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Such allegations typically "include the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'" *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F.Supp.2d 298, 313-14 (D.Md. 2000) (quoting *Windsor Assocs., Inc. v. Greenfeld*, 564 F.Supp. 273, 280 (D.Md. 1983)). In cases involving concealment or omissions of material facts, however, meeting Rule 9(b)'s particularity requirement will likely take a different form. *See Shaw v. Brown & Williamson Tobacco Corp.*, 973 F.Supp. 539, 552 (D.Md. 1997) (recognizing that an omission likely "cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation" (internal quotations omitted)). The purposes of Rule 9(b) are to provide the defendant with sufficient notice of the basis for the plaintiff's claim; to protect the defendant against frivolous suits; to eliminate

12

fraud actions where all of the facts are learned only after
discovery; and to safeguard the defendant's reputation.   *See*
*Harrison*, 176 F.3d at 784.

B.   **Analysis**

Wells Fargo contends that, when Mr. Piotrowski's claims are
"measured on an individualized basis," each count of the
complaint must be dismissed because (1) the conduct complained
of is not actionable under the statutes cited or (2) the factual
allegations are insufficient to meet Mr. Piotrowski's pleading
burden.  (ECF No. 11, at 1-6).   Mr. Piotrowski responds that
Wells Fargo's arguments inappropriately rely on facts and
evidence extrinsic to the complaint and that, when such
information is disregarded, the complaint pleads sufficient
facts to support each count asserted therein.   Mr. Piotrowski
alternatively requests leave to amend if any of his claims are
held to be deficient.  As a second alternative, Mr. Piotrowski
asks for consideration of the motion to be deferred pending
additional discovery and submits a certification pursuant to
Fed.R.Civ.P. 56(d) attesting to the specific information he
seeks to discover. (*See* ECF No. 14, at 12 & ECF No. 14-1).

Because Wells Fargo is not moving for summary judgment but
instead seeks to test the sufficiency of the complaint's
allegations pursuant to Rule 12(b)(6), it is not appropriate to
defer consideration of its motion under Rule 56(d).   Rather,

each of Mr. Piotrowski's claims will be analyzed on an individualized basis, and the allegations of the complaint will be disregarded only where they conflict with properly considered exhibits. *See Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F.Supp.2d 678, 683 (D.Md. 2001) ("When the bare allegations of the complaint conflict with any exhibits or other documents, whether attached or adopted by reference, the exhibits or documents prevail.").[5]

### 1.  Count I – Equal Credit Opportunity Act

The ECOA "contain[s] broad anti-discrimination provisions that 'make it unlawful for any creditor to discriminate against any applicant with respect to any credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age.'" *Capitol Indem. Corp. v. Aulakh*, 313 F.3d 200, 202 (4th Cir. 2002) (quoting 15 U.S.C. § 1691(a)(1)). The ECOA —

---

[5] Although Mr. Piotrowski purports to assert claims on behalf of a putative class of homeowners, this case has not been certified as a class action under Fed.R.Civ.P. 23. Therefore, each count of the complaint must be examined to determine whether Mr. Piotrowski himself states a claim for relief in accordance with the pleading requirements set forth in Rules 8(a) and 9(b). *See, e.g.*, *Epps v. JPMorgan Chase Bank, N.A.*, No. WMN-10-1504, 2012 WL 5250538, at *2 (D.Md. Oct. 22, 2012) ("[Plaintiff's] claims cannot be 'typical' within the meaning of Rule 23(a)(3) if she does not have a claim herself[.]"); *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1170 (3d Cir. 1987) ("[W]e find no abuse of discretion in the district court's refusal to consider certification of a class before determining whether the named plaintiff, and *a fortiori* any putative class which the named plaintiff might properly seek to represent, had a federal cause of action.") (internal citations omitted).

along with its accompanying Regulation B, 12 CFR § 202 *et seq*. — also establishes certain notification requirements that a creditor must satisfy.

Relevant here, Section 1691(d) of the ECOA provides that:

> (1) Within thirty days (or such longer reasonable time as specified in regulations of the Bureau for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.
>
> (2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by —
>
> > (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
> >
> > (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(1)-(2).

Before turning to whether Mr. Piotrowski's specific allegations state one or more plausible claims under the ECOA, it is necessary to resolve the parties' dispute about whether Subsections (d)(1) and (d)(2) impose distinct requirements on creditors.   According to Mr. Piotrowski, the Subsections are independent provisions that can give rise to separate causes of action.   (ECF No. 14, at 21).   Thus, in his opposition, Mr. Piotrowski construes the complaint as alleging two types of ECOA violations:   (1) Wells Fargo's failure to provide timely notice of its action in response to each of his three modification requests, in violation of Subsection 1691(d)(1); and (2) Wells Fargo's failure to provide an explanation for declining each of his loan modification requests, in violation of Subsection 1691(d)(2).[6]   Wells Fargo, by contrast, argues that Subsection

---

[6] In the complaint, Mr. Piotrowski appears to allege that Wells Fargo also violated the ECOA by failing to evaluate his loan modification requests "in a manner required by the Md. Code Regs. 09.03.06.20."   (ECF No. 1 ¶ 68).   The cited regulation establishes a duty of good faith and fair dealing upon "licensees" in connection with, *inter alia*, the servicing of a mortgage loan.   *See* Md. Code Regs. 09.03.06.20.   As Wells Fargo points out, however, the regulation does not apply to any person "specifically exempt from licensure under Financial Institutions Article, § 11-502, Annotated Code of Maryland."   Md. Code Regs. 09.03.06.01.   In other words, the duty of good faith and fair dealing does not apply to "[a]ny bank, trust company, savings bank, savings and loan association, or credit union incorporated or chartered under the laws of this State or the United States or any other-state bank having a branch in this State."   Md. Code Ann., Fin. Inst. § 11-502.   Moreover, "[e]nforcement of [Md. Code Regs. 09.03.06.20] . . . is committed exclusively to

1691(d) imposes a single obligation on creditors – namely, to provide notice of any adverse action taken on an application for credit.   According to Wells Fargo, the complaint fails to establish that this single obligation was ever triggered because the complaint does not allege that Wells Fargo ever took "adverse action" on any of Mr. Piotrowski's loan modification requests.  (ECF No. 17, at 9).

Mr. Piotrowski's reading of the ECOA is consistent with the statute's express language, as Subsections (d)(1) and (d)(2) impose separate obligations on creditors.   Under Subsection 1691(d)(1), a creditor "must provide notice of any action, whatever that action may be." *Ortega v. Wells Fargo Bank, N.A.*, No. 3:11cv01734, 2012 WL 275055, at *4 (N.D.Ohio Jan. 31, 2012) (agreeing that Subsections (d)(1) and (d)(2) "require distinct actions" by a creditor).   Thus, a plaintiff states a claim under Subsection (d)(1) by alleging that a creditor "failed to provide timely notice in response" to the plaintiff's application for credit. *Coulibaly v. J.P. Morgan Chase Bank, N.A.*, No. DKC 10-3517, 2011 WL 3476994, at *16 (D.Md. Aug. 8, 2011).

Subsection 1691(d)(2), by contrast, speaks to the content that must be included in a creditor's notice to an applicant, if

the Commissioner of Financial Regulation." *Zervos v. Ocwen Loan Servicing, LLC*, No. 1:11-cv-03757-JKB, 2012 WL 1107689, at *6 (D.Md. Mar. 29, 2012) (citing Md. Code Regs. 09.03.06.16).

the action taken is an adverse one. *See Ortega*, 2012 WL 275055, at *4. In order to state a claim under Subsection 1691 (d)(2), a plaintiff must allege both (1) that the creditor took an adverse action on his application and (2) that the creditor provided an insufficient explanation for that action. *See Coulibaly*, 2011 WL 3476994, at *16-17. Mr. Piotrowski's allegations regarding his three loan modification requests will be analyzed under each Subsection.

    **a.  First Loan Modification**

With respect to the First Modification Request, the complaint fails to state a claim under either Subsection 1691(d)(1) or Subsection 1691(d)(2).

As detailed above, Mr. Piotrowski alleges that he submitted his First Modification Request on an unspecified date in January 2011.[7] Although he conclusorily alleges that Wells Fargo "never provided [him] with a written statement of denial of his Frist Modification Request" (ECF No. 1, at 10 ¶ 33), Mr. Piotrowski also avers that Wells Fargo informed him on February 7, 2011 that he was approved for a Special Forbearance Agreement, which

---

[7] In its reply, Wells Fargo states that "[t]he Plaintiff's first application for a modification was allegedly complete on January 26, 2011." (ECF No. 17, at 6). The paragraph of the complaint that Wells Fargo cites to, however, actually alleges that Wells Fargo "confirmed" to Mr. Piotrowski on or about January 26, 2010, that it "had all the documentation it needed for the First Modification Request." (ECF No. 1 ¶ 25).

gave him the option of paying a reduced mortgage payment of $1,657.79 for the months of March, April, and May 2011, during which time Wells Fargo would consider modifying his loan "as he had applied." (*Id.* ¶ 28).  The Piotrowskis signed the Special Forbearance Agreement on February 18.  (ECF No. 11-3).

These allegations establish that Wells Fargo provided a response to the First Modification Request on February 7, 2012, by sending a counteroffer, the Special Forbearance Agreement. Notably, however, Mr. Piotrowski fails to plead the specific date on which he submitted his completed First Modification Request, but instead generally avers that it was "in January 2011." (ECF No. 1 ¶ 24).  Absent this critical fact, the well-pleaded allegations do not establish more than the mere possibility that Wells Fargo violated the ECOA's 30-day notice requirement by waiting to send notice of its counteroffer until February 7, 2011.  Thus, Mr. Piotrowski fails to state a Subsection 1691(d)(1) claim in connection with the First Modification Request.

As to whether the complaint alleges a violation of Subsection 1691(d)(2), it is significant that, pursuant to Regulation B, there is no "adverse action" under the ECOA when "the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant . . . expressly accepts the credit offered."  12 CFR

§ 202.2(c)(2)(ii).[8]   Wells Fargo's extension of the Special Forbearance Agreement shortly after its receipt of the First Modification Request, followed by the Piotrowskis' acceptance thereof, fits squarely within this provision.  Because there was no "adverse action," Wells Fargo had no obligation under Subsection 1691(d)(2) in connection with the First Modification

---

[8] Regulation B defines "adverse action" as follows:

(1) The term means:

(i) A refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered;

(ii) A termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts; or

(iii) A refusal to increase the amount of credit available to an applicant who has made an application for an increase.

(2) The term does not include:

. . .

(ii) Any action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account; . . .

12 CFR § 202.2(c)(1)-(2).

Request.    Accordingly,  both  of  the  ECOA  claims  asserted  in connection  with  Mr.  Piotrowski's  First  Modification  Request  will be dismissed.

**b.   Second Modification Request**

With  respect  to  the  Second  Modification  Request,  the complaint  states  a  plausible  ECOA  claim  under  Subsection 1691(d)(1), but not under Subsection 1691(d)(2).

As  to  Subsection  1691(d)(1),  Mr.  Piotrowski  alleges  that he  submitted  his  completed  Second  Modification  Request  on  April 26,  2011,  and  that  Wells  Fargo  failed  to  provide  him  "with  a written  statement  of  denial,"  either  before  sending  him  the Notice  of  Default  on  May  15,  2011  or  at  any  point  thereafter. Based  on  this  alleged  failure  by  Wells  Fargo  to  provide  any notice  (timely  or  otherwise)  of  its  alleged  declination,  the complaint  states  a  plausible  ECOA  claim  under  Subsection 1691(d)(1) as to the Second Modification Request.

By  contrast,  the  allegations  do  not  establish  that  Wells Fargo  violated  Subsection  1691(d)(2)  in  connection  with  the Second  Modification  Request  as  Mr.  Piotrowski  admits  that  he  was in  default  at  the  time  when  the  application  was  purportedly denied.    Regulation  B  specifically  defines  "adverse  action"  to exclude  "any  action  or  forbearance  relating  to  an  account  taken in  connection  with  inactivity,  default,  or  delinquency  as  to that  account."    12  C.F.R.  §  202.2(c)(2)(ii).    Pursuant  to  this

provision, numerous courts have held that a plaintiff's voluntary acceptance of an agreement that temporarily reduces the amount of his monthly mortgage payment places him in default and relieves a creditor's obligation to comply with Subsection 1691(d)(2)'s adverse action notification requirement. *See, e.g.*, *Ortega*, 2012 WL 275055, at *5 (where the plaintiff voluntarily defaulted on her mortgage loan by accepting a temporary loan modification agreement, the servicer had no obligation to provide an adverse action notification when it denied the plaintiff's permanent loan modification request); *Davis v. CitiMortgage, Inc.*, No. 10-12136, 2011 WL 891209, at *2-3 (E.D.Mich. Mar. 11, 2011) (same).   The default status of a consumer is determined at the time the creditor takes action with respect to the consumer, rather than at the time the consumer applies for credit.   *Id.*

In the complaint, Mr. Piotrowski avers that he accepted the Special Forbearance Agreement and made his March, April, and May 2011 mortgage payments accordingly.   The terms of the Special Forbearance Agreement expressly put Mr. Piotrowski on notice that his loan "w[ould] not be contractually current" if he paid in accordance with the payment schedule provided.   (ECF No. 11-3).   Mr. Piotrowski further avers that he made a cure payment representing "the difference between his regular payment and the Special Forbearance Agreement payments" on or about May 26,

2011.   (ECF No. 1, at 10 ¶ 34).   By expressly alleging his acceptance of the Special Forbearance Agreement, his payments pursuant thereto, and his need to make a cure payment on May 26, 2011, Mr. Piotrowski admits that he was in default on his mortgage loan during the relevant time period – *i.e.*, between April 26, 2011 (the date he submitted the Second Modification Request) and May 15 (the date before which Wells Fargo allegedly declined the Second Modification Request).   *See, e.g.*, *Davis*, 2011 WL 891209, at *3 ("[B]y alleging that she paid reduced monthly payments under the Trial Plan, Plaintiff admits that she was not current on her mortgage loan.").   Thus, based on the facts alleged, Wells Fargo had no obligation under Subsection 1691(d)(2) to provide a "statement of reasons" explaining its purported declination of Mr. Piotrowski's Second Modification Request.

### c.   Third Modification Request

Finally, as to the Third Modification Request, the complaint states a plausible ECOA claim under both Subsections 1691(d)(1) and 1691(d)(2).

Mr. Piotrowski alleges that he submitted the completed Third Modification Request on or about May 25, 2011, and that Wells Fargo never provided him with a written response or denial.   (ECF No. 1, at 10 ¶ 29; *id.* at 12 ¶ 35).   Here again, by virtue of Wells Fargo's alleged failure to provide any

response, the complaint states a claim under Subsection 1691(d)(1) as to the Third Modification Request. As to Subsection 1691(d)(2), Wells Fargo's argument that inaction does not constitute "adverse action" for purposes of the ECOA is not persuasive. Failing to act on an application for credit is a *de facto* denial, such that Wells Fargo's alleged inaction on the Third Modification Request triggered the adverse action notification obligations imposed by Subsection 1691(d)(2).

In sum, Mr. Piotrowski can proceed with his Subsection 1691(d)(1) claims related to the Second and Third Loan Modification Requests. Because the complaint fails to allege the specific date on which Mr. Piotrowski submitted his First Modification Request, the Subsection 1691(d)(1) claim concerning that application will be dismissed without prejudice to Plaintiff's right to amend. Likewise, because the complaint does not allege that Wells Fargo took any "adverse action" in connection with the First or Second Modification Requests, Mr. Piotrowski can proceed with a Subsection 1691(d)(2) claim only as to the Third Modification Request.[9]

---

[9] In the complaint's class allegations, Mr. Piotrowski avers that one of the questions common to the putative class members is "whether Wells Fargo's conduct violates . . . state law requirements relating to Equal Credit." (ECF No. 1 ¶ 42(d)). In Count III, Mr. Piotrowski also alleges that Wells Fargo's compliance with the "Maryland Equal Credit Protection Act" was a precondition to its right to foreclose on the Property. (*Id.*

2.    **Count II – Maryland Consumer Debt Collection Act**

The MCDA "prohibits debt collectors from utilizing threatening or underhanded methods in collecting or attempting to collect a delinquent debt." *Bradshaw v. Hilco Receivables, LLC*, 765 F.Supp.2d 719, 731-32 (D.Md. 2011) (citing Md. Code Ann., Com. Law § 14-202).   Relevant here, debt collectors "may not . . . [c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist."   Md. Code Ann., Com. Law § 14-202(8).

Mr. Piotrowski alleges that Wells Fargo violated the MCDA by "threatening" to foreclose on the Property "with knowledge that [its] right did not exist under Maryland or Federal law until [it] complied with the ECOA, the Maryland Equal Credit Protection Act, and Md. Code Regs. 09.03.06.20."   (ECF No. 1 ¶ 79).   Wells Fargo argues that the Notice of Default accurately described its right to foreclose on the Property, which is established by the deeds of trust and is not dependent on its compliance with any of the statutes or regulations cited by Mr. Piotrowski.   Wells Fargo's position is persuasive.

In Maryland, the right to initiate foreclosure proceedings typically arises upon the borrower's default.   *See, e.g.*, *Pac.*

---

¶ 79).   These isolated references cannot be read to assert a separate cause of action under the Maryland Equal Credit Opportunity Act, Md. Code Ann., Com. Law § 12-701 *et seq.*

*Mortg. & Inv. Group, Ltd. v. LaGuerre*, 81 Md.App. 28, 40-41 (1989) ("[W]hen a petition to foreclose a mortgage pursuant to an assent to a decree is filed, stating simply that the mortgage is in default, such petition is sufficient to sustain the foreclosure proceeding so long as any one of the provisions of the mortgage, the violation of which can constitute a default under the terms of the mortgage, is in default . . . generally the sale may not be enjoined unless it is determined that none of the pertinent provisions of the mortgage are in default."); *Marchese v. JPMorgan Chase Bank, N.A.*, No. GLR-12-1480, 2013 WL 136427, at *9 (D.Md. Jan. 8, 2013) ("[Lender's] right to foreclose came about when [plaintiff] defaulted on his mortgage[.]"); *Stewart v. Bierman*, 859 F.Supp.2d 754, 770 (D.Md. 2012) (dismissing MCDCA claim where the plaintiffs "concede they were in default on their mortgage payments"). Thus, with respect to mortgage loans that are not insured by the federal government, a servicer's compliance with statutes and regulations is generally not a condition precedent to initiating foreclosure proceedings once a borrower defaults. *See Wincopia Farm, LP v. Goozman*, 188 Md.App. 519, 531-32 (2009); *Stovall v. SunTrust Mortg. Inc.*, No. RDB-10-2836, 2011 WL 4402680, at *9 (D.Md. Sept. 20, 2011) (servicer's alleged non-compliance with federal loan modification guidelines did not change the fact

26

that its "right to foreclose came about when [the plaintiff] defaulted on her mortgage").[10]

Here, as discussed, the allegations in the complaint establish that Mr. Piotrowski accepted the terms of the Special Forbearance Agreement; submitted his payments for March, April, and May 2011 in accordance with the schedule set forth in that agreement; and made a cure payment on or about May 26, 2011. In so pleading, Mr. Piotrowski admits to defaulting voluntarily on his mortgage loan and remaining in default until on or about May 26, 2011. *See, e.g.*, *Davis*, 2011 WL 891209, at *3 (in alleging that she paid reduced monthly payments under a trial loan modification plan, the plaintiff also admitted that "she was not current on her mortgage loan"). Mr. Piotrowski thus also admits that he was in default as of May 15, 2011, when Wells Fargo sent the Notice of Default. That notice advised the Piotrowskis

---

[10] By contrast, a mortgagor of a loan that is insured by the Fair Housing Administration ("FHA") may seek to enjoin foreclosure proceedings based on the mortgagee's violation of regulations promulgated by the U.S. Department of Housing and Urban Development, even if the mortgagor is in default, where such regulations are "alluded to in the parties' FHA-prescribed form deed of trust." *Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 728 (2007) ("[U]nder principles of equity, a mortgagee's commencement of a foreclosure proceeding on an FHA-insured mortgage, without first having adhered to the mandatory HUD loss mitigation regulations, may invalidate the mortgagee's declaration of default."). Here, the complaint does not allege that Mr. Piotrowski's mortgage loan was FHA-insured, nor do the deeds of trust "allude to" any of the statutes or regulations relied on by Mr. Piotrowski in his complaint.

(1) that their loan was in default; (2) that they had the option to make a cure payment by June 29, 2011; and (3) that, in the event they failed to cure, Wells Fargo would "proceed with acceleration" and also might "take steps to terminate [their] ownership in the property by a foreclosure proceeding." (ECF No. 11-4).   The Notice of Default thus accurately described Wells Fargo's remedies under Paragraph 22 of the Piotrowskis' primary deed of trust. (*See* ECF No. 11-1).  Even assuming that Wells Fargo violated the ECOA or its state analogue in connection with Mr. Piotrowski's loan modification requests, such violations would have no bearing on its contractual foreclosure rights.[11]  Accordingly, the complaint fails to state a claim under the MCDCA in connection with the Notice of Default because Mr. Piotrowski cannot establish that Wells Fargo claimed, attempted, or threatened to enforce its right to foreclose with knowledge that the right did not exist. Accordingly, Count II will be dismissed with prejudice.

---

[11]  In arguing that the complaint states a claim under the MCDCA, Mr. Piotrowski urges the court to take judicial notice of a consent order entered into between Wells Fargo and the federal government.  (ECF No. 14, at 23).   Mr. Piotrowski fails, however, to explain how this document has any bearing on whether the Notice of Default accurately described Wells Fargo's foreclosure rights.

3. **Count III – Maryland Consumer Protection Act**

The MCPA, codified at Md. Code Ann., Com. Law §§ 13-101, *et seq.*, "was intended to provide minimum standards for the protection of consumers in [Maryland]." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 140 (2007). The Act is intended to be liberally construed in order to achieve its consumer protection objectives. *See State v. Cottman Transmissions Sys., Inc.*, 86 Md.App. 714, 743 (1991).

Under the MCPA, "a person may not engage in any unfair or deceptive trade practice" related to "[t]he extension of consumer credit" or the "collection of consumer debts." Md. Code Ann., Com. Law § 13-303. Section 13-301(1) defines "[u]nfair or deceptive trade practices" to include, *inter alia*: (1) any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"; (2) any "[f]ailure to state a material fact if the failure deceives or tends to deceive"; and (3) any violation of certain enumerated state statutes, including the MCDCA. To assert a claim for false or misleading statements under the MCPA, Mr. Piotrowski must allege not only that Wells Fargo made a false or misleading statement, but also that the statement caused him an actual loss or injury. *See Citaramanis v. Hallowell*, 328 Md. 142, 152 (1992).

29

The complaint alleges that the following acts or omissions by Wells Fargo "had the capacity, tendency or effect of deceiving Mr. Piotrowski" in violation of the MCPA:   (1) the threat of foreclosure proceedings; (2) the charging of fees notwithstanding Mr. Piotrowski's acceptance of, and compliance with, the Special Forbearance Agreement; and (3) an unspecified collection of misrepresentations and failures to disclose.  (*See* ECF No. 1 ¶¶ 81-94).[12]

### a.   "Threat" of Foreclosure

Wells Fargo's alleged "threat of prosecution of a foreclosure action" does not state a claim under the MCPA because, based on the facts alleged, it cannot be viewed as an unfair or deceptive practice.  As already discussed, in light of Mr. Piotrowski's admission that he voluntarily defaulted on the loan by accepting the Special Forbearance Agreement, the Notice of Default accurately explained the potential consequences of leaving the default uncured.  Under the express terms of the primary deed of trust, those consequences included the possibility that foreclosure proceedings would be initiated.

---

[12] In his opposition, Mr. Piotrowski argues, for the first time, that Wells Fargo also violated a separate provision of the MCPA, which provides that a mortgage loan servicer "shall respond in writing to each written complaint or inquiry within 15 days if requested."  (ECF No. 14, at 38 (citing Md. Code Ann., Com. Law § 13-316(c)(2)).  As Wells Fargo contends in its reply, however, the complaint cannot be construed as asserting a claim under this provision.  (ECF No. 17, at 13).

Therefore, the Notice of Default could not have misled or deceived Mr. Piotrowski.

### b. "Bogus" Late Fees

The allegation that Wells Fargo charged Mr. Piotrowski $128.43 in late fees, even though he accepted and complied with the terms of the Special Forbearance Agreement, also does not state a claim under the MCPA. The Special Forbearance Agreement expressly put the Piotrowskis on notice that, upon successful completion of the Agreement, "they may still have outstanding payments and fees." (ECF No. 11-3). Although the Special Forbearance Agreement stated that "[a]ny outstanding payments and fees will be *reviewed* for a loan modification," it did not contain any promise to grant a permanent loan modification that would forgive such fees. (*Id.*) (emphasis added). In light of this language, the late fees allegedly charged by Wells Fargo to Mr. Piotrowski cannot constitute an "unfair or deceptive practice" within the meaning of the MCPA.

### c. Misrepresentations and Material Omissions

When the allegations regarding the "bogus" late fees and the "threat" of foreclosure are excluded, a close reading of the complaint reveals only a handful of affirmative representations made by Wells Fargo: (1) a statement by an unnamed representative on January 26, 2010 informing Mr. Piotrowski that his First Modification Request had been received and "approved";

31

(2) the representation by Wells Fargo in the Special Forbearance Agreement delivered on February 7, 2011 that Mr. Piotrowski would continue to be considered for a loan modification "as he had applied"; (3) a request by Ms. Sanders on April 25, 2011, to resubmit his modification request; (4) a statement by an unnamed Wells Fargo representative on August 11, 2011, informing Mr. Piotrowski that his Third Modification Request had been received and forwarded to the underwriting division for review; and (5) a statement by Ms. Greenwall on September 15, 2011, promising Mr. Piotrowski that he would receive an update on his Third Modification Request no later than September 19.  With respect to omissions, the complaint generally alleges that, despite Mr. Piotrowski's regular communications with Wells Fargo and its representatives, Wells Fargo never informed him, either orally or in writing, that his loan modification requests were simply being ignored, thus constituting a "fail[ure] to disclose material facts." (ECF No. 1 ¶ 85).

Wells Fargo advances four arguments as to why these allegations fail to state an MCPA claim, none of which are availing.  First, Wells Fargo contends that Mr. Piotrowski fails to allege that Wells Fargo or its representatives ever made an objectively false statement.  Under the MCPA, however, statements do not need to be false to be actionable.  Rather, a representation that is merely misleading can constitute an

unfair or deceptive trade practice.  As noted in Mr. Piotrowski's opposition, the gravamen of his MCPA claim is that Wells Fargo's omissions and misrepresentations "gave the clear impression to [him] that [Wells Fargo] would consider his multiple requests for a loan modification" even though the servicer actually had chosen to "simply ignore[]" them.  (ECF No. 14, at 28).  Thus, Mr. Piotrowski alleges that Wells Fargo's actions did, in fact, deceive him into believing that his modification requests were being given serious consideration.

Second, Wells Fargo asserts that the MCPA allegations in the complaint sound in fraud yet do not meet Rule 9(b)'s heightened pleading standard.  The complaint provides ample details about the dates, times, and contents of Wells Fargo's communications with Mr. Piotrowski.  Although it is true that Mr. Piotrowski pleads Wells Fargo's purported material omissions in less specific terms, Rule 9(b)'s particularity requirements are relaxed in this context because an omission typically "cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation." *Shaw*, 973 F.Supp. at 552.  Moreover, the substance of the alleged omissions is clear:  despite repeatedly communicating with Mr. Piotrowski, Wells Fargo failed to disclose that it was not actually considering Mr. Piotrowski's requests but had instead summarily ignored them.

33

This is sufficient to meet the relaxed Rule 9(b) standard as it provides Wells Fargo with notice for the basis of Mr. Piotrowski's MCPA claim.

Third, Wells Fargo contends that violations of the ECOA and its state law counterpart cannot give rise to a claim under the MCPA.  Section 13-301(14) of the MCPA establishes that a violation of certain statutes constitutes a *per se* violation of the MCPA.  As Wells Fargo notes, the ECOA is not specifically enumerated in this section.  It is not clear, however, why this omission necessarily means that facts giving rise to an ECOA violation cannot also serve as the basis for an MCPA claim, provided the conduct satisfies some other prong of the statute. To the contrary, the first statute listed in Section 13-301(14) is "[t]his title," *i.e.*, a violation of the MCPA itself.

Finally, Wells Fargo argues that Mr. Piotrowski fails to allege any cognizable damages attributable to Wells Fargo's alleged deceptive trade practices.  As noted, Mr. Piotrowski avers that he suffered a variety of damages as a result of Wells Fargo's alleged conduct, including damage to his credit; lost time from work and legal fees to resolve his dispute without the need for litigation; and emotional distress in the form of anxiety and insomnia.  Although it is not clear that Mr. Piotrowski will be able to prove that these damages were the result of being deceived into believing that Wells Fargo was

actually considering his modification requests (as opposed to, for example, Wells Fargo's ultimate refusal to grant Mr. Piotrowski's request for a permanent loan modification[13]), the complaint's damages allegations are sufficient to survive a Rule 12(b)(6) motion.  *See, e.g.*, *Marchese*, 2013 WL 136427, at *12 (plaintiff sufficiently pled actual injury by alleging, *inter alia*, that he suffered emotional and physical distress; attorney fees; and damage to his credit); *Allen*, 2011 WL 3425665, at *10 (plaintiff's allegations of "damage to [her] credit score [and] emotional damages" sufficient to allege "an actual injury or loss as a result of a prohibited practice under the MCPA").

In sum, Count III will be dismissed, with prejudice, to the extent Mr. Piotrowski seeks recovery under the MCPA for being charged with $128.43 in late fees and being "threatened" with foreclosure.  Mr. Piotrowski can, however, proceed with MCPA claim to the extent it alleges that Wells Fargo's representations and omissions misled him into believing that he was actually being considered for a permanent loan modification.

---

[13] Although it seems likely that any damages Mr. Piotrowski suffered are the result of being denied a permanent loan modification as opposed to having been misled about the extent of Wells Fargo's consideration of his requests, none of Mr. Piotrowski's causes of action, as currently alleged, depend on allegations that Wells Fargo violated federal loan modification guidelines relating to the Home Affordable Modification Program ("HAMP").  Thus, the parties' arguments regarding the preemptive effect of HAMP need not be reached.

### 4.   Count IV - Maryland Mortgage Fraud Protection Act

The MMFPA generally provides that "[a] person may not commit mortgage fraud."  Md. Code Ann., Real Prop. § 7-402. Relevant here, the statute defines mortgage fraud to include:

> (1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process . . . .

*Id.* § 7-401(d)(1).  The statute defines "mortgage lending process" to include "[t]he solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan." *Id.* § 7-401(e)(2).

In the complaint, Mr. Piotrowski alleges that Wells Fargo committed mortgage fraud in violation of the MMFPA by making "deliberate misstatements, misrepresentations and omissions during the mortgage lending process," including by ignoring his loan modification requests and by "commenc[ing] and carr[ying] out" state foreclosure proceedings.  (ECF No. 1 ¶ 103).

Wells Fargo asserts that Mr. Piotrowski's entire MMFPA claim fails because the definition of "mortgage lending process" does not encompass post-origination collection and foreclosure activities.  (ECF No. 17, at 16-18).  This argument, however, has been rejected on numerous occasions by courts in this

district.  *See, e.g.*, *Stovall*, 2011 WL 4402680, at *10 ("[T]he plain language of the [MMFPA] clearly countenances post-closing servicing activities[.]"); *Marchese*, 2013 WL 136427, at *13 (relying on *Stovall* to reject argument that the MMFPA excludes "loan servicing with regard to defaulting borrowers").  Wells Fargo's arguments regarding legislative intent and statutory construction do not warrant a departure from these prior interpretations of the MMFPA.

Wells Fargo is nonetheless correct in observing that the complaint does not include any *factual* allegations that Wells Fargo ever initiated or completed foreclosure proceedings on the Property owned by the Piotrowskis.  Thus, Mr. Piotrowski's MMFPA claim will be dismissed to the extent it relies on the conclusory allegation that Wells Fargo improperly "commenced and carried out" state foreclosure proceedings.

As to the allegations that Wells Fargo committed mortgage fraud by failing to respond to Mr. Piotrowski's loan modification requests, Wells Fargo's arguments are largely duplicative of those advanced in connection with the MCPA claim. Because Mr. Piotrowski states an MCPA claim based on Wells Fargo's alleged representations and omissions about its consideration of his loan modification requests, the complaint also states an MMFPA claim based on the same conduct.  *See Marchese*, 2013 WL 136427, at *14 (determining the sufficiency of

an MMFPA claim pursuant to Rule 12(b)(6) involves "the same analysis" conducted for an MCPA claim).[14]

## IV.  Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendant Wells Fargo Bank, N.A., will be granted in part and denied in part.  A separate Order will follow.

 

 

 

                                  /s/
                                  _____
                                  DEBORAH K. CHASANOW
                                  United States District Judge

---

 

[14] In its motion, Wells Fargo also asks that the first eight pages of the complaint be stricken because they "contain a diatribe of allegations relating to foreclosures which have *nothing* to do with the claims advanced by the Plaintiff." (ECF No. 11, at 2).  Rule 12(f) permits the court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Rule 12(f) motions are disfavored, however, and "should be denied unless the allegations 'have no possible relation to the controversy and may cause prejudice to one of the parties.'"  *Graff v. Prime Retail, Inc.*, 172 F.Supp.2d 721, 731 (D.Md. 2001).  Although it does appear that many of the allegations in the first portion of the complaint are irrelevant to Mr. Piotrowski's individual claims, it cannot be said that they "have no possible relation to the controversy" or that leaving them intact would somehow prejudice Wells Fargo.  Thus, Wells Fargo's informal request to strike will be denied.