IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT PIOTROWSKI        :

       :

      v.        :    Civil Action No. DKC 11-3758

       :

WELLS FARGO BANK, NA       :

       :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this mortgage loan modification case are: (1) a motion for class certification filed by Plaintiffs (ECF No. 50); and (2) three motions to seal (ECF Nos. 58, 59, 61). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs' motion for class certification will be denied. The three motions to seal will be granted.

**I. Background**

The factual background was explained in the January 22, 2013 memorandum opinion, thus only those facts relevant to the instant dispute will be discussed. (*See* ECF No. 20). Robert Piotrowski filed a complaint on December 29, 2011, asserting claims on behalf of a putative class of homeowners who have been damaged by Wells Fargo's alleged failures to comply with applicable federal and state laws in connection with their

mortgage loan modification requests. The four-count class action complaint asserted claims under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(d) ("ECOA"); the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law § 14-201 *et seq.* ("MCDCA"); the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 *et seq.* ("MCPA"); and the Maryland Mortgage Fraud Protection Act, Md. Code Ann., Real Prop. § 7-401 *et seq.* ("MMFPA").

Mr. Piotrowski and his wife, Iwona Piotrowski, own property located in North Potomac, Maryland ("the Property"). They became concerned about their mortgage in December 2010 and allegedly submitted a completed loan modification application to Wells Fargo, the servicer of their mortgage loan, in January 2011, at a time when they were current on their mortgage loan. In response to certain correspondence from Wells Fargo, the Piotrowskis later submitted two more loan modification requests on April 26, 2011 and May 25, 2011, respectively. As relevant to the ECOA claims, the Piotrowskis asserted that: (1) Wells Fargo failed to provide timely notice of its action in response to each of his three modification requests, in violation of 28 U.S.C. § 1691(d)(1); and (2) Wells Fargo failed to provide an explanation for declining each of the loan modification requests in violation of 28 U.S.C. § 1691(d)(2).

Wells Fargo moved to dismiss the complaint. A memorandum opinion and order were issued on January 22, 2013, granting in part and denying in part the motion to dismiss. (ECF Nos. 20 & 21). Leave to amend was granted to allow Mr. Piotrowski to join Iwona Piotrowski as an additional plaintiff. The court agreed with the Piotrowskis that Subsections (d)(1) and (d)(2) of the ECOA impose separate obligations on creditors. (ECF No. 20, at 17). The January 22 opinion held, in relevant part, that: (1) the complaint failed to state a claim under either Subsection 1691(d)(1) or Subsection 1691(d)(2) as to the first loan modification request (*id.* at 18-21); (2) with respect to the second loan modification request, the complaint stated a plausible ECOA claim under Subsection 1691(d)(1) only (*id.* at 21-23); and (3) the complaint stated a plausible ECOA claim under both Subsections 1691(d)(1) and 1691(d)(2) with respect to the third loan modification request (*id.* at 23-24).

Consistent with the memorandum opinion, an amended complaint was filed on February 12, 2013 to add Iwona Piotrowski as an additional plaintiff, "correct misnomers in the original complaint, and clarify certain factual allegations." (ECF No. 22). A scheduling order was issued and discovery commenced. After several motions to modify the scheduling order were granted, on January 30, 2015 Plaintiffs moved to certify a class only as to the ECOA claims. (ECF Nos. 50 & 51). Defendant

opposed the motion (ECF No. 54), and Plaintiffs replied (ECF No. 60).  Plaintiffs and Defendant moved to seal in their entirety their respective memoranda and exhibits in connection with the motion for class certification.  The court issued a memorandum opinion and order on January 19, 2015 denying both motions to seal without prejudice to the filing of a property supported motion.   (ECF No. 57).   The parties subsequently filed supplemental motions to seal.  (*See* ECF Nos. 58, 59, 61).

## II.  Analysis

### A.  Rule 23 Certification

A district court has "wide discretion" in deciding whether class certification is appropriate.  *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010) (*quoting Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (internal quotation marks omitted)).   The burden of establishing class status is on Plaintiffs, *Bullock v. Bd. of Educ. of Montgomery County*, 210 F.R.D. 556, 558 (D.Md. 2002), and "[t]he court has a duty to undertake a 'rigorous analysis'" to ensure that the requirements of class certification have been met.  *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 215 (D.Md. 1997) (*citing Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982)).   The United States Court of Appeals for the Fourth Circuit has noted:

> If it were appropriate for a court simply to
> accept the allegations of a complaint at
> face value in making class action findings,
> every complaint asserting the requirements
> of Rule 23(a) or (b) would automatically
> lead to a certification order, frustrating
> the district court's responsibilities for
> taking a "close look" at relevant matters,
> *Amchem* [*Prods., Inc. v. Windsor*], 521 U.S.
> [591,] 615 [1997], for conducting a
> "rigorous analysis" of such matters, *Falcon*,
> 457 U.S. at 161, and for making "findings"
> that the requirements of Rule 23 have been
> satisfied. . . . "*it is appropriate to
> conduct controlled discovery into the
> 'merits,' limited to those aspects relevant
> to making the certification decision on an
> informed basis.*"

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004)
(*quoting* Fed.R.Civ.P. 23 advisory committee's note to 2003
amendments) (emphasis in original); *see also Amgen Inc. v.
Connecticut Retirement Plans and Trust Funds*, 133 S.Ct. 1184,
1194-95 (2013) (noting that although Rule 23 does not give
district courts a "license to engage in free-ranging merits
inquiries at the certification stage," a court should consider
merits questions to the extent "that they are relevant to
determining whether the Rule 23 prerequisites for class
certification are satisfied."). "A party seeking class
certification must do more than plead compliance with the []
Rule 23 requirements. . . . Rather, the party must present
evidence that the putative class complies with Rule 23." *EQT
Production Co.*, 764 F.3d at 357.

The class must satisfy the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy. Specifically, Rule 23(a) provides:

> (a)Prerequisites.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

If those requirements are met, the class must satisfy at least one of the three sub-parts of Rule 23(b), which will be discussed below.

Moreover, although not specified in Rule 23, the proposed class must be adequately defined and clearly ascertainable. *Bailey v. Patterson*, 369 U.S. 31, 33 (1962); *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989).  The Fourth Circuit recently discussed the ascertainability requirement in *EQT Production Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014):

> We have repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be "readily identifiable." *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972); *see also In re A.H. Robins Co.*, 880 F.2d 709, 729 (4th Cir. 1989) ("though not specified in [Rule 23], establishment of a class action implicitly requires . . . that there be an identifiable class . . ."),

*abrogated on other grounds, Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1977). Our sister circuits have described this rule as an "ascertainability" requirement. *See, e.g., Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-94 (3[d] Cir. 2012); *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (4th Cir. 2007); In *re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 44-45 (2[d] Cir. 2006).

However phrased, the requirement is the same. A class cannot be certified unless a court can readily identify the class members in reference to objective criteria. *See Marcus*, 687 F.3d at 593; *see also Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579-80 (1st Cir. 1986) (finding that a class failed to satisfy Rule 23 requirements because it would be impossible to identify class members without "individualized fact-finding and litigation").

The plaintiffs need not be able to identify every class member at the time of certification. But "[i]f the class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593; *see also* 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (3[d] ed. 2005) ("[T]he requirement that there be a class will not be deemed satisfied unless . . . it is administratively feasible for the court to determine whether a particular individual is a member.").

The Eleventh Circuit recently explained the administrative feasibility requirement in *Bussey v. Macon County Greyhound Park, Inc.*, 562 F.App'x 782, 787-88 (11th Cir. 2014):

"An identifiable class exists if its members can be ascertained by reference to objective criteria." *Fogarazzo v. Lehman*

> *Bros., Inc.*, 263 F.R.D. 90, 97 (S.D.N.Y.
> 2009). The analysis of the objective
> criteria also should be administratively
> feasible. "Administrative feasibility"
> means "that identifying class members is a
> manageable process that does not require
> much, if any, individual inquiry." *Newberg
> on Class Actions* § 3.3 p. 164 (5[th] ed. 2012).
> Where a plaintiff satisfies this threshold
> issue, the district court then "conducts a
> rigorous analysis of the [R]ule 23
> prerequisites." *Vega v. T-Mobile USA, Inc.*,
> 564 F.3d 1256, 1266 (11th Cir. 2009)
> (citation and internal quotation marks
> omitted).

(citing trial court opinion); *Karhu v. Vital Pharmaceuticals, Inc.*, ---F.App'x----, 2015 WL 3560722 (11th Cir. 2015) (same).

## 1. Ascertainability

### a. Class Definition

Plaintiffs' class definition has evolved over time. In the memorandum accompanying the motion for class certification, Plaintiffs define the class as follows:

> All individuals who obtained a loan secured
> by property located in Maryland whose loans
> (i) have been serviced by Wells Fargo; (ii)
> since two years[1] preceding this action; and
> (iii) have submitted an application to
> change the terms of their existing mortgage
> without requesting additional advances or
> credit; and (iv) were not provided written
> notice within 30 days of submitting an
> application regarding the action taken on
> the application; or (v) were not provided
> within 60 days of submitting the application

---

[1] Plaintiffs do not specify a precise time frame, but the complaint was brought on December 29, 2011, so presumably the class period would cover the period from December 29, 2009 until December 29, 2011.

> with a written statement of reasons (or a
> disclosure that a borrower can request such
> a statement) regarding an adverse action
> taken on the application.

(ECF No. 51, at 2).  Based on objections raised by Defendant in

its opposition, in the reply memorandum Plaintiffs propose

adding the following qualifier to the end of subpart (v):

> (v) were not provided with a written
> statement of reasons (or a disclosure that a
> borrower can request such a statement)
> regarding an adverse action taken on the
> application within 60 days of submitting the
> application and were not delinquent or in
> default at the time of the action.

(ECF No. 60, at 27).[2]

Defendant argues that the amended complaint lacks any

allegations relating to the notice requirements under the ECOA

for *incomplete* applications, but that based on the arguments in

their motion for class certification, Plaintiffs appear to have

expanded the class definition beyond what was alleged in the

amended complaint.  Specifically, Defendant asserts that the

amended complaint only alleged violations of Sections 1691(d)(1)

and (d)(2) and 12 C.F.R. § 202.9(a)(1)(i) pertaining to complete

applications, whereas Plaintiffs seek to expand the class to

---

[2] Plaintiffs added the qualifier that the class cover
persons who were not delinquent or in default at the time of the
action because under the ECOA, an adverse action "does not
include a refusal to extend additional credit under an existing
credit arrangement where the applicant is delinquent or
otherwise in default, or where such additional credit would
exceed a previously established credit limit."  15 U.S.C. §
1691(d)(6).

cover purported violations of notice requirements pertaining to incomplete applications.

The fact that Plaintiffs modified the class definition beyond what was included in the amended complaint is not necessarily dispositive. The court possesses the power to modify the class definition. *See Jenkins v. Massinga*, 592 F.Supp. 480, 487 (D.Md. 1984); *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 497 (D.Md. 1998); *Givens v. Van Devere, Inc.*, No. 5:11CV666, 2012 WL 4092738, at *15 (N.D.Ohio Sept. 17, 2012) ("Courts have discretion to modify proposed class definitions to make it administratively feasible to determine class membership."). Indeed, in *EQT*, 764 F.3d at 360, a case cited by Defendant in support of certification denial, the Fourth Circuit remanded with instructions to the district court to "determine whether it is possible to adjust the class definitions to avoid or mitigate the administrative challenges we have identified." Judge Bennett explained in *In re Titanium Dioxide Antitrust Litig.*, 962 F.Supp.2d 840, 860-61 (D.Md. 2013):

> Rule 23(c)(1)(C) of the Federal Rules of Civil Procedure provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment. Fed.R.Civ.P. 23(c)(1)(C). This Court has previously held that a federal district court possesses "broad discretion in determining whether to modify or even decertify a class." *Wu v. MAMSI Life &*

*Health Ins. Co.*, 256 F.R.D. 158, 162 (D.Md. 2008) (*citing Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation.")). In fact this Court has "an affirmative obligation to ensure that the class membership remains at all times consistent with the underlying facts and procedural posture of the case." *Id.* at 162-63 (*citing Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("Under Rule 23 . . . the district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.")); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 544 (E.D.Va. 2000) (same).

Accordingly, the proper inquiry is whether Plaintiffs' proposed class definition results in an ascertainable and administratively feasible class and meets Rule 23 requirements, not whether it precisely tracks the allegations and class definition in the amended complaint. *See also In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("Holding plaintiffs to the plain language of the class definition would be overly formalistic. . . . Second, holding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition. District courts are permitted to limit or modify class definitions to provide the necessary precision."); *Robidoux v. Celani*, 987 F.2d 931, 937 (2[d] Cir. 1993) ("A court is

not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."); *Harris v. Gen. Dev. Corp.*, 127 F.R.D. 655, 659 (N.D.Ill. 1989) ("[I]t is certainly within this court's discretion to limit or redefine the scope of the class").  Moreover, as Plaintiffs argue, the amended complaint sought class treatment for the ECOA claims as well as the various Maryland statutory claims and the "amended class definition tailors the criteria to the ECOA claim by shortening the class period, removing mention of foreclosure which does not relate to the Piotrowskis' ECOA claims, and including an additional criterion for those individuals who suffered only a violation of § 1691(d)(2)."  (ECF No. 60, at 27).

### b. Notice Requirements under the ECOA

Next, Defendant argues that the proposed class definition mischaracterizes the notice requirements under the ECOA:

> Plaintiffs continuously mischaracterize ECOA, particularly in the Proposed Expanded Class Definition which includes individuals who "have submitted an application . . . and were not provided ***written*** notice *within 30 days **of submitting** an application* regarding the action taken on the application. . ." . . .  As is evident from the plain language of Section 1691(d) of ECOA and its implementing regulations, however, notice of an incomplete submission can initially be provided orally.  *See*, 12 C.F.R. §§ 202.9(a)(1)(ii) and 202.9(c) . . . Otherwise, *written* notice is only required within 30 days of an "adverse action" taken

>           on a *complete* application under 15 U.S.C. §§
>           1691(d)(1) and (d)(2) of ECOA and 12 C.F.R.
>           § 202.9(a)(1)(i) of its underlying
>           regulations . . . and then, only if, a
>           borrower is not then in default.

(ECF No. 55, at 17)(emphasis in original).

Sections 1691(d)(1) and (d)(2) and the implementing regulations impose separate obligations on creditors. Section 1691(d)(1) requires that "[w]ithin thirty days . . . after receipt of a completed application for credit, a creditor shall notify the applicant of its action taken on the application." (emphasis added). Under Section 1691(d)(1), creditors have an obligation to provide a timely response as to *any* action taken on an application, whatever that action may be. *See, e.g., Offiah v. Bank of Am., N.A.*, Civ. Action No. DKC 13-2261, 2014 WL 4295020, at *7 (D.Md. Aug. 29, 2014). A creditor also has a duty to notify an applicant if an application is incomplete. *See, e.g., Kaswell v. Wells Fargo Bank, N.A.*, Civ. Action No. RDB-13-2315, 2014 WL 3889183, at *3 (D.Md. Aug. 6, 2014) ("Defendant's argument that Plaintiff's Complaint is lacking because it does not allege that Plaintiff submitted a completed application does not relieve Defendant of its duties under § 1691(d)(1)."). 12 C.F.R. § 202.9(a) provides, in relevant part:

>           (1) When notification is required. A
>           creditor shall notify an applicant of action
>           taken within:

*(i) 30 days after receiving a completed application* concerning the creditor's approval of, counteroffer to, or adverse action on the application;

*(ii) 30 days after taking adverse action on an incomplete application, unless notice is provided in accordance with paragraph (c) of this section.*

When an application is incomplete, paragraph (c) provides that:

(1) Notice alternatives.   Within 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either:

(i) Of action taken, in accordance with paragraph (a) of this section [regarding notice of adverse action on an incomplete application]; or

(ii) Of the incompleteness, in accordance with paragraph (c)(2) of this section.

12 C.F.R. § 202.9(c)(1).   Paragraph (c)(2) covers notice of

incompleteness and provides:

If additional information is needed from an applicant, the creditor *shall send a written notice* to the applicant specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application.   The creditor shall have no further obligation under this section if the applicant fails to respond within the designated time period.   *If the applicant supplies the requested information within the designated time period, the creditor shall take action on the application and*

14

> *notify the applicant in accordance with paragraph (a) of this section*.

12 C.F.R. § 202.9(c)(2) (emphases added).  Although paragraph (c)(2) states that notice of the incompleteness needs to be in writing, Paragraph (c)(3) provides that "[a]t its option, a creditor *may inform the applicant orally* of the need for additional information.  If the application remains incomplete the creditor shall send a notice in accordance with paragraph (c)(1) of this section."  12 C.F.R. § 202.9(c)(3) (emphasis added).  Thus, the creditor has a duty to notify an applicant if the application is incomplete, but it can elect to do so orally and only if the application remains incomplete is the creditor required to send written notice of the incompleteness.  To summarize, Regulation 202.9(c) provides that a creditor must do one of two things when confronted with an incomplete application: (1) the creditor can notify the applicant within thirty (30) days of receiving the application of its approval of, counteroffer to, or adverse action on the application in accordance with Section 202.9(a); or (2) the creditor can notify the applicant of the required information within thirty days of receiving the incomplete application in accordance with Section 202.9(c)(2), requiring written notice, or Section 202(c)(3), allowing creditor to inform the applicant orally.  *See Kirk v.*

*Kelley Buick of Atlanta, Inc.*, 336 F.Supp.2d 1327, 1332 (N.D.Ga. 2004).

Section 1691(d)(2) of the ECOA, on the other hand, discusses the notification requirements concerning an *adverse action* taken after a creditor receives a completed application. Specifically, 15 U.S.C. § 1691(d)(2) provides:

> (2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor.  A creditor satisfies this obligation by --
>
> (A) providing statements of reasons *in writing* as a matter of course to applicants against whom adverse action is taken; or
>
> (B) giving *written notification* of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained.  *Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.*

(emphases added).

Subpart (v) of Plaintiffs' proposed class definition covering applicants who "were not provided with a written statement of reasons (or a disclosure that a borrower can request such a statement) regarding an adverse action taken on the application within 60 days of submitting the application"

misstates the creditor's obligations pursuant to Section 1691(d)(2).   An applicant against whom adverse action is taken is entitled to: (1) be given a statement of reasons in writing; *or* (2) be given written notification of the adverse action which *discloses* the applicant's right to a statement of reasons from the creditor within thirty days, provided the applicant requests the statement of reasons from the creditor within sixty days of receiving the written notification of the adverse action. Accordingly, the statement of reasons does not have to be in writing provided the applicant is advised in the written notification of an adverse action of his right to request a statement of reasons.[3]   Moreover, Plaintiffs' wording of subpart (v) of their proposed class definition is imprecise and may suggest that it would cover only notification of adverse action taken on *incomplete applications*, due to the reference to "submission of an application" as opposed to submission of a "complete application."

---

[3] 15 U.S.C. § 1691(d)(5) provides, in relevant part, that the requirements of Section 1691(d)(2) "may be satisfied by verbal statements or *notifications* in the case of any creditor who did not act on more than one hundred and fifty applications during the calendar year preceding the calendar year in which the adverse action is taken, as determined under regulations of the Bureau." (emphasis added).   Wells Fargo has not argued that it meets this exception to the notification requirement.

**c. Analysis of Ascertainability and Administrative Feasibility**

With these principles in mind, the court turns to the ascertainability requirement.  It is not clear at all from the proposed class definition whether Plaintiffs intend the definition to cover those individuals who submitted *incomplete* applications, but were not provided notice either of an adverse action taken on the incomplete application or regarding the incompleteness pursuant to 12 C.F.R. § 202.9(c).  For instance, Plaintiffs argue in their memorandum in support of class certification that a common question among the class is "[w]hether Wells Fargo violated 12 C.F.R. § 202.9(a) or (c) of Regulation B by failing to provide *written* notice to a borrower within 30 days of receiving an incomplete application."  (ECF No. 51, at 10) (emphasis added).  At least initially, however, creditors may provide notice of incompleteness and request additional information from the applicant orally.  *See* 12 C.F.R. § 202.9(c)(3).  Moreover, Plaintiffs have provided no evidence that individuals who were provided notice *orally* that their application was incomplete could be ascertained.  Plaintiffs also have provided no evidence that a class could be ascertained consisting of individuals who were not notified within thirty (30) days of an adverse action taken on an incomplete

application or were notified in writing that their application was incomplete.

Subpart (iv) of the proposed class definition – covering individuals who were not provided written notice within 30 days of submitting an application regarding action taken on the application – also is lacking in precision and does not accurately capture the requirements of the ECOA.  As set forth above, "Section 1691 provides two rights to applicants.  First, it requires a creditor to notify the applicant of its 'action' on the application within 30 days of receiving a *completed application.*  *See* 11 U.S.C. § 1691(d)(1).  Second, where the creditor takes an 'adverse action' with respect to an application, it is required to provide a statement of reasons for the denial.  *Id.* at § 1691(d)(2)." *MacDonald v. Wells Fargo Bank N.A.*, Case No. 14-cv-04970-HSG, 2015 WL 1886000, at *2 (N.D. Cal. Apr. 24, 2015) (emphasis added).  Receipt of a *complete* application by the creditor triggers the running of the thirty (30) day time-frame to provide notice of any action on the loan modification application.

Plaintiffs take the position that a class of individuals who were not provided notice of any action taken by the creditor after the applicant submitted a *complete* application in violation of Section 1691(d)(1) can be ascertained through a code – ▮ – in the Wells Fargo database.  Plaintiffs believe

that this code allows Wells Fargo to determine when an application is complete, which triggers the running of the thirty (30) day period for notifying an applicant of any action pursuant to Section 1691(d)(1).   Citing to a regulation under the Real Estate Settlement Procedures Act ("RESPA") pertaining to a "complete loss mitigation application," Defendant erroneously argues that the ECOA does not define the term "completed application."   12 C.F.R. § 202.2(f), an implementing regulation of the ECOA, defines a "completed application" as:

> an application in connection with which *a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested* (including, but not limited to, credit reports, *any additional information requested from the applicant*, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral).   The creditor shall exercise reasonable diligence in obtaining such information.

(emphases added).

Kerri Crabtree, a Senior Vice President of Default Decisioning at Wells Fargo, provided the following deposition testimony explaining the process Wells Fargo uses to determine when an application is "complete":

> Q: Well, for a loan modification, what you understand a loan modification to be, what triggers the 30 day period running from your

understanding of bank policy, Wells Fargo policy?

A: . . . So the home preservation specialist, HPS collects all the docs. They believe that they have what constitutes a complete package to send on to the underwriter. The underwriter then goes through that package with a fine tooth comb and reviews it.

They at times believe, yes, we have a full package and they make the decision. They at times say no, we don't, and we need to ta[ke] that back to the home preservation specialist to go back to the customer for additional documentation. When that happens and they go back to the customer for additional documentation, that restarts the 30 day clock. It did then and it does now with the AG settlement.[4]

*So that application is not deemed complete until the underwriter makes the decision, totally.* Now, you can go back now with the AG settlement and say all the docs were in, the underwriter agrees with that. They make the decision and we do have a code now that pertains to we believe we have a complete ap[plication], but that's from the AG Settlement forward, *but until that underwriter really reviews the package and deems they have everything that that investor group requires to make that decision, it is not deemed a complete application* and that is the way the AG settlement sees it, as well.

---

[4]   In February 2012, Wells Fargo entered into a Consent Judgment in *United States of America et al. v. Bank of America Corp., et al.*, Case No. 1:12-cv-00361-RMC in the United States District Court for the District of Columbia. (*See* Exh. A10 to Defendant's opposition, filed in hard copy with the Clerk's Office). The Consent Judgment was part of a larger settlement with forty-nine attorneys general in the Mortgage Servicer Litigation.

> Q: So before the AG Settlement, what was the
> bank's policy?
>
> A: It's the same as I stated. Until that
> underwriter underwrote that file and deemed
> that everything necessary was there to make
> a decision, that constituted a complete
> applica[tion.] . . .

(ECF No. 51-1, at 61-62) (emphases added).

Defendant argues that "Plaintiffs' claims and the
identification of the proposed class are subject to a subjective
assessment of when a borrower's loan modification application is
complete." (ECF No. 55, at 19). Plaintiffs counter that
"[t]he term *regularly* [in Section 202.2(f)] is an objective term
that refers to the core set of documents that a creditor, such
as Wells Fargo, collects from applicants as opposed to every
document that may be needed to ultimately decide a specific
application. Thus, an application is complete when Wells Fargo
has received that core set of documents that it *regularly*
collects from applicants." (ECF NO. 60, at 10) (emphasis in
original). Plaintiffs attempt to show that there is a specific
point in time when the application is "complete," which,
according to Plaintiffs, happens when the Home Preservation
Specialist obtains all of the documents requested from the
applicant and the application is forwarded to an underwriter for
review. Plaintiffs contend that the information collected by
the Home Preservation Specialist is that which "the creditor

22

regularly obtains" under 12 C.F.R. § 202.2(f), thus at the point when such information is obtained, the application is "complete" and notice of any action taken on the application should be provided within thirty (30) days.

Both parties' arguments are misguided. "[C]ourts have interpreted th[e] language [in Section 202.2(f)] to mean that 'an application is considered 'complete' not when the applicant completes it . . . but when the creditor has obtained verifying information and whatever other types of reports or information it ordinarily requires to evaluate a loan.'" *King v. JPMorgan Chase Bank*, Civ. Action No. 11-cv-01880-KLM, 2013 WL 3353879, at *3 (D.Colo. July 3, 2013) (*citing High v. McLean Fin. Corp.*, 659 F.Supp. 1561, 1563-64 (D.D.C. 1987)); *Faulkner v. Glickman*, 172 F.Supp.2d 732, 740-41 (D.Md. 2001) (finding that there was a genuine dispute of material fact as to whether an application was complete; "Plaintiff has not in this record presented evidence indicating that the document in question was not something which defendant 'regularly obtains and considers in evaluating applications for the amount and type of credit requested.'"). Thus, an application may not be complete until the creditor has obtained corroborating information. Plaintiffs have provided no evidence as to what information Wells Fargo regularly obtained and considered in evaluating loan modification applications *during the applicable time period*

(from December 29, 2009 through December 29, 2011), and whether the Home Preservation Specialists or the underwriters collected such information.  The only evidence on the record related to information that Wells Fargo regularly obtains and considers relates to what it *currently* collects (as opposed to what it collected from 2009 through 2011) and suggests that an underwriter occasionally requires additional information from applicants to evaluate and/or verify an application:

> Interrogatory No. 2: Identify in detail the procedures in place at Wells Fargo for providing responses to modification requests on distressed credits.
>
> Answer No. 2: It is assumed that the terms distressed credits as used in this interrogatory means loans that are in default or in imminent risk of default. *Those procedures applicable to modification requests on such loans have changed over time.*  *Currently*, Wells Fargo attempts to promptly acknowledge a modification request and to provide the borrower(s) with the name and contact information for the person(s) assigned to their modification.   The borrower(s) is requested to complete a Request for Mortgage Assistance (RMA) and to provide information and documentation needed to evaluate them for loan modification options applicable to their loan and other loss mitigation options, *which can vary depending on the investor which holds the loan.*  This may include:
>
> ·Documentation verifying income, such as bank statements, paystubs, profit-and-loss statements, and statements for any benefits the borrower and co-borrower receive.

24

·The most recent statement for each the borrower's and co-borrower's bank, retirement and investment accounts, such as savings, money market, CD, bond, stock, IRA, and 401k

·The borrower's[] most recently filed and signed federal tax return with all schedules (including Schedule E – Supplemental Income and Loss)

·Documents verifying the amount, duration, and frequency of payments for child support, alimony, or separation maintenance if the borrowers want them to be considered

·A list of all monthly household expenses, including payments for credit cards, car loans, other mortgages, or any other debt obligations

·A signed and dated description of financial hardship.

. . .

Borrowers are requested to provide the information sought and to complete and return required forms by a specified date. Often borrowers fail to provide all the information and documentation requested of them *or the information provided by them leads to additional requests for information*. When information becomes stale, requests are also made for updated information. . . .

If timely information requested by the contact person assigned to the borrower's modification request is received, the borrower's modification request is then reviewed by an underwriter to determine if the borrower is eligible for the modification sought. *Occasionally this review results in additional requests for information or updated information.*

(ECF No. 51-1, at 243-44, Wells Fargo's responses to interrogatories) (emphases added). It is possible that for a subset of borrowers, the loan modification application may have been "complete" at the time the ███ code was entered by the Home Preservation Specialist, but, as will be seen, identifying that subset requires reviewing individualized loan files.

Defendant is mistaken, however, that a creditor's *subjective* assessment of when an application is "complete" triggers ECOA's notice requirements. The court in *Newton v. United Companies Financial Corp.*, 24 F.Supp.2d 444, 460-61 (E.D.Pa. 1998), provided helpful guidance regarding the term "completed application" under Section 12.202(f):

> [I]mplicit in the Board's definition of "completed application" is the possibility that a creditor might base credit decisions on different considerations and on different amounts and types of information, depending on the *amount* and on the *type* of credit requested. The commentary further instructs that "[a] creditor has the latitude under the regulation to establish its own application process and to decide the type and amount of information it will require from credit applicants." 12 C.F.R. Pt. 202, Supp. I, Staff Commentary, 2(f)(1). . . United relies heavily on the fact that the Regulations give it "wide latitude" in determining its application procedure and what constitutes a completed application. *This is true, but the Regulations instruct equally that the lender is bound by the substance of its actual practices, not merely what it chooses to call a completed application.*

(emphasis added).

Plaintiffs contend that "[b]y Wells Fargo's logic, all that is required to undermine the entire ECOA's notice requirements is subjectively defining an application to be complete only when written notice is sent to the borrower – however long that may be after the borrower submits the application." (ECF No. 60, at 10). Both parties overlook that Regulation B also mandates that "[t]he creditor shall use reasonable diligence in obtaining such information," thus the creditor may not delay obtaining all of the required information to "complete" the application. *See, e.g., King*, 2013 WL 3353879, at *3 ("If Defendant has not used reasonable diligence in obtaining the information necessary to complete Plaintiff's credit application, the Court will not allow Defendant to use incompleteness to shield itself from ECOA liability."). The commentary to Section 202.2(f) further explains:

> 6. Completed application – diligence requirement. The regulation defines a completed application in terms that give a creditor the latitude to establish its own information requirements. *Nevertheless, the creditor must act with reasonable diligence to collect information needed to complete the application.* For example, the creditor should request information from third parties, such as credit reports promptly after receiving the application. If additional information is needed from the applicant, such as an address or a telephone

> number to verify employment, the creditor
> should contact the applicant promptly.

12 C.F.R. § Pt. 202, Supp. 1 (emphasis added).

Here, Wells Fargo's practice was that the Home Preservation Specialist would collect a "core" set of documents from loan modification applicants, forward the application to the Underwriter for review, at which point the Underwriter (based on his/her review) may determine that additional information was needed from an applicant to complete and/or verify the application and make a decision. *See, e.g., Torgerson v. Wells Fargo Bank South Dakota, N.S.*, No. CIV 05-1050, 2009 WL 255995, at *11 (D.S.D. Feb. 3, 2009) (interpreting 12 C.F.R. § 202.2(f) and reasoning that "Wells Fargo may have been entitled to request the information requested by Wolff . . . The Big Talk loan application may not have been 'complete' at that time since Torgerson declined to provide the additional information requested by the bank. Questions exist as to whether Wells Fargo itself considered the application complete when the application was forwarded to its underwriter."); *Kirk*, 336 F.Supp.2d at 1332 ("[I]t appears that verification of an applicant's salary, references, and phone number are sometimes required by Capital One before granting credit and, therefore, an application is incomplete without the required verifications."). The record does not clarify whether, during

the applicable time period as defined by Plaintiffs, the Home Preservation Specialist or an underwriter obtained an applicant's credit report to verify the information provided. Multiple witnesses provided deposition testimony that although the Home Preservation Specialist collects specific information from applicants, when the application is transferred to the underwriter for "decisioning," the underwriter may determine that additional information is needed.   For instance, Kerri Crabtree explained:

> Q: So that package goes out from the home modification or the Home Preservation Specialist and that package goes out and the borrower only sends back half the documents to the Home Preservation Specialist.  Does the Home Preservation Specialist then say look, your application is not complete. You're missing all these documents?
>
> A: Yes.
>
> Q: So that's clearly not a completed application.  If the package goes out and the borrower doesn't include all the documents requested in the package, then that won't go to underwriting; correct?
>
> A: That is correct.
>
> Q: The Home Preservation Specialist sends it to underwriting when the Home Preservation Specialist believes that all the documents the preservation specialist has requested of the borrower have been provided by the borrower; correct?
>
> A: That is correct.

Q: Okay.  And is that event recorded in the system?

A: Yes.

. . .

Q: And does the system have in place a particular letter saying this is the date that the Home Preservation Specialist said the application was complete and send it to underwriting, we got to get back to the borrowers in 30 days with something during the period before the AG Settlement?

A: *Well, no, because in all times we wouldn't really have deemed that a complete application yet until the underwriter looked at it.  The HPS would believe they had everything but until the underwriter looked at it, we would not have known that it was a complete application – not a complete application – I guess that's the way we view it – that all documents were there to make a decision.*

Q: But your Home Preservation Specialist has made a determination that all the documents they had requested for a complete application were there and was sending that on to the underwriter to make a decision; correct?

A: But sir, they don't have the expertise that the underwriter does to deem that a complete ap[plication] that everything is there to make a decision. They are the document collectors.  They are not the decisioner.

(ECF No. 51-1, at 65-66) (emphasis added).

Courtney Weaver, a research remediation analyst with Wells Fargo, provided the following deposition testimony explaining

Defendant's process concerning the transfer of applications and when they are considered "complete":

> A: So to walk you through a process, the home preservation specialist is going to try to gather as much of the required documents from the borrower for review; however, the home preservation specialist does not have the training to underwrite the file. They can identify documents to ensure that they think they have everything that is needed for a decision. *Example being, they will gather your last year's tax return, the home preservation specialist isn't going to have full knowledge to decide do I have all the documents, if this borrower is self-employed, to know it if they have business tax returns or need additional bank statements.* The underwriter will decide and review that in fine detail to ensure we have all of the documentation from the borrower necessary to make a complete decision.

(ECF No. 55-8, at 5) (emphasis added); (ECF No. 51-1, at 66 ("Q: And then underwriting may look at these documents and say, hey, we need something more from this borrower because there's something I see on these documents that the borrower gave us that tells us – that tells me I need some more documents from them to make a decision; is that right? A: That's true.")). Similarly, Philip Cargioli, who served as a loan servicing specialist, home preservation underwriter, and a loan verification analyst with Wells Fargo, gave deposition testimony stating that an application may not be complete until an underwriter has reviewed it:

A: That would be marked as ready by the HPS,
but ultimately, it would need to be reviewed
by an underwriter who would really dig in
and find inconsistencies in the income.  I
mean, it's a multitude of things that – or
questions that could come up.  Sometimes the
underwriter would still need a letter of
explanation.

So when the HPS would send it and say
all documents received, it would then go to
an underwriter like myself, who would review
the documents with a fine-toothed comb, make
sure that there was -- every I was dotted
and every T was crossed, every document was
signed, everything made sense.

At that point, [] I would be able to
review all of the documents and be satisfied
with those documents.  At that point, I
would [] decision the file.

. . .

Q:  So you're saying the underwriting
department makes the decision that an
application -- that you have sufficient
documents that's been completed, and that's
when the 30-day period starts?  As far as
your understanding of the procedure is?

A: Yes.  After the underwriter has reviewed
the documents submitted by the HPS *and it
meets the standards of that underwriter for
that particular investor and that particular
timeframe*, then an underwriter would make
the decision that, you know, this loan can
be processed for a review.

. . .

Q: How does the bank track whether or not,
from the date that the application is
completed, that it's 30 days -- that the
approval or denial is made within 30 days of
the date the application is completed?

> A: That would require an individual like myself who has familiarity with loss mitigation reviews and systems of record to *go through the notes as well as the image folder to determine what was required and when the last of the documents were submitted it to deem it complete by the underwriter*.

(ECF No. 55-5, at 13-14) (emphases added).

Ms. Weaver emphasized that the Home Preservation Specialist collects only the minimum amount of documents from an applicant and that at the time the █████code is entered into the database the application still may not be complete:

> Q: And the home preservation specialists are instructed on a lender-by-lender basis the documents that need to be regularly obtained so that those lenders – that lender's criteria can be considered by the underwriting department, correct?
>
> . . .
>
> A: . . . So, yes, each investor is going to have certain documents based off of the review that is being sought out and obtained by the borrower that the home preservation specialist would have to obtain from the borrower.
>
> . . .
>
> A: Next to the ████, it says, ready for decision.
>
> Q: So what – how does ████ get entered into the workstation, what happens?
>
> A: Can I ask what time period you're asking from?
>
> Q: Well, when did ████ first go into use?

A: I've actually researched that, and I don't have the exact date that it was created; however, if you refer to some of the documents and in Mr. McCall's testimony, there is — from 2009 that code was in use.

Q: Okay.  And it gets entered — does that code get entered into a workstation by a home preservation specialist?

A: The home preservation specialist would enter that code.

Q: And when would they do that?

A: *After they've received the minimum documents from the borrower and sent it to the underwriter for review.*

Q: So after they've received the documents that they've been instructed to regularly obtain for a particular investor for it to go to the underwriting department to be considered for review, then they enter the ▮▮▮code?

A: Correct.

. . .

Q: []  Are there any codes that you could search that would say when a correspondence had gone out to a borrower from Wells Fargo or one of its related entities after the ▮▮ or similar code has been entered in the database?

A: So, no.  There's no letter code that's — or code that's entered for that.

. . .

A: I do want to clarify with the list and how you're speaking to it, there is a package that does go to the borrower that gives the description of what they need to

> send in.   If they send in all those
> documents and the HPS feels it is everything
> that they need to have the underwriter
> review, they will send it for review. *The
> underwriter will then also review the
> documents. And at that point in time if it
> does not satisfy all the requirements or if
> the documents present discrepancies or
> questions or need further information, that
> is when it is sent back to the HPS to
> communicate with the borrower to request
> additional documents.*

(ECF No. 51-1, at 82-83, 86) (emphases added); (*see also* ECF No. 55-6, at 11, McCall depo, "Q: Okay.  Have you seen in the data that you have pulled codes which reflect that an underwriter has returned a file to an HPS or SPOC, single point of contact, to ask for additional information in order to underwrite a loan modification request? A: I have seen examples in the data where the workflow goes back and forth between the internal parties, the underwriters, and the specialists for numerous reasons, that being one of them.").  Moreover, Ms. Weaver testified that the ███ code differed as to meaning over time.  For instance, when first used in 2009, it meant "filed to negotiator," and then it changed into "ready for decision" in 2010, again becoming "sent to negotiator" sometime between 2010 and July of 2014.  (ECF No. 55-8, at 6-7).

   One of Plaintiffs' attorneys submitted a declaration stating that he reviewed a spreadsheet containing a list of loans for which the borrower sought modification of the terms of

the loan sometime between January 2009 and November 2013. (ECF
No. 60-1, at 52, declaration of Andrew Murphy). The applicable
time period here is December 2009 until December 2011, however.
Plaintiffs' counsel further declares:

> 3. After reviewing only 753 of the 8,543
> pages of that spreadsheet (approximately
> 8.8% of the total number of pages), I was
> able to identify 114 unique loans meeting
> the following criteria: (1) containing an
> Activity Step Code ███ date after December
> 28, 2009; (2) containing a gap of more than
> thirty day between the ███ date and entry of
> the next code by the Underwriter; and (3)
> application submitted for the purpose of
> seeking a loan modification as opposed to
> liquidation.

(*Id.* at 52-53). Plaintiffs argue that "the class will consist
of some subset of those borrowers whose loan files contain more
than 30 days between the ███ date entered by the HPS and the
date of the next code entered by the Underwriter." (ECF No. 60,
at 12). While that might be true, it would require examination
of each file to determine whether additional information was
regularly obtained after that date. Plaintiffs also do not
specify how many of the 114 loans that they reviewed (of the
8,543 pages provided) fall into the applicable time frame as
defined by them. *See, e.g., EQT Production Co.*, 764 F.3d at 359
("Without even a rough estimate of the number of potential
successors-in-interest, we have little conception of the nature
of the proposed classes or who may be bound by a potential

merits ruling.   Lacking even a rough outline of the classes'
size and composition, we cannot conclude that they are
sufficiently ascertainable.").

Wells Fargo provides evidence that servicing or imaging
notes of individual loan files would need to be reviewed to
determine whether a loan modification application was complete
depending on the information the creditor regularly obtained and
considered for the amount and type of credit requested.   Thus,
determining when an application became "complete" would require
fact-intensive, individualized inquiries on a loan by loan
basis.   *See, e.g., Murfitt v. Bank of America NA*, No. EDCV 13-
01182 JGB (SPx), 2013 WL 7098636, at *4 (C.D.Cal. Oct. 22, 2013)
("Whether Plaintiff's application was 'complete' pursuant to the
statute is a question of fact, and will depend on the type of
information the Defendant regularly obtains and considers in
evaluating credit applications"); *Errico v. Pacific Capital
Bank, N.A.*, 753 F.Supp.2d 1034, 1043 (N.D.Cal. 2010) ("[W]hether
Plaintiffs' application for the loan as to the condominium was,
in fact, complete will depend on the type of information
Defendants regularly obtain and consider in evaluating credit
applications.").   This record demonstrates that Wells Fargo did
not utilize a "one size fits all" approach to collection of
documents in connection with loan modification applications.
Instead, the Underwriters could determine – based on the minimum

37

documentation that an applicant submitted to an HPS – that additional information was needed from the applicant. Section 12 C.F.R. 202.2(f) also does not appear to contemplate a "one size fits all" because the information that the creditor regularly obtains and considers in evaluating applications varies based on "the amount and type of credit requested." The fact that Wells Fargo cannot determine apart from performing a loan-by-loan review when a loan modification application was complete poses an administrative barrier to ascertaining a class who were not provided written notice of any action on their completed application within thirty (30) days from submission.

Along the same lines, identifying potential class members as to whom Wells Fargo *violated* the distinct notice requirements under the ECOA concerning notification of any action within thirty days after receiving a completed application would essentially entail "mini trials" and would not be administratively feasible. An individual loan-by-loan review would have to be undertaken as to what correspondence was sent by Wells Fargo (and when) after a completed application was received. Mr. Cargioli explained:

> Q: [] Could you go to a borrower and look quickly to see if they have received a letter turning them down for a loan or a modification?
> . . .

Q: I don't want to know how much time it would take.  Just tell me what you would do, sir.

A: I would open up the image viewer, enter in the loan number that corresponds with that loan, and that would pull up the imaged documents for that file.  I would then have to sort through and find the correct label for that letter.  And then I would, of course, open up the letter and verify that it was what the descriptor said.

Q: But is there a way to find that letter other than -- are you saying you have to scan through every single document in the file?  Isn't there a faster way to find that letter?

A: . . . [A]ll the documents are input separately with descriptors, so I would be able to – I would not need to go through every single document, but would need to, you know – what I would do personally is look through a certain number of documents that I felt, you know, pertained to a loss mitigation denial letter or approval letter and I would – I would open those up and inspect them.

Q: You're saying -- is there a list in the image of every document there where you could see – and a specific document called loss – loan modification denial?

. . .

A: . . . It's a list of descriptors, and when you click on the descriptor like a link, an image of that – of that descriptor will pop up, and you are able to view that image that you selected.

So if I was looking for a denial letter or a letter notifying the borrower of a loss mitigation option, I would look at letter correspondance.  *I would look at all the*

*letter correspondence documents, and I would
need to find the ones that pertain to
denials.*

Q: So in other words, there's this index of
the documents, but if you click on a
particular document, it'll take you right to
the imaged document?

A: That's correct.

Q: And there's a section, and there's a
table – there's sort of a topic category,
and one is correspondence or letters to the
borrower, and there's other document
categories that are imaged in addition to
letters, correct?

A: Yes.

Q: So there would be loan application --
there would be applications for loan
modification?   Would that be a separate
category?

. . .

A: For -- a loan application would not have
its own name.   If the – the document was
identifiable as a specific document such as
-- an example would be a hardship letter,
the document would be input as a hardship
letter.   If the document could not be
identified by the person placing the
document into imaging, then it would be
labeled as, you know, loss mitigation
package, or it could be labeled as just sort
of like a general – we would know what the
purpose of the package was for, but we
wouldn't know exactly what documents were
inside.

(ECF No. 55-5, at 10-11) (emphasis added); (*see also* ECF No. 55-

6, at 12, McCall depo ("Q: In your efforts to pull data in this

case for the purpose of discovery, were you able to find data

queryable codes which reflected when letters were sent to borrowers? A: No."). Wells Fargo would have to review imaged or scanned documents on an individual loan-by-loan basis to ascertain the specific correspondence that was sent to applicants and when. Plaintiffs suggest that even though the data may not be maintained in a searchable format in Wells Fargo's queryable database, as long as Wells Fargo has the records to identify the applicable information, the class is ascertainable. Plaintiffs' argument is unpersuasive. "A plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Kahru*, ---F.App'x----, 2015 WL 3560722, at *3. For the reasons explained, identifying class members based on the parameters identified by Plaintiffs would not be administratively feasible and essentially require "mini trials" to determine whether borrowers belong in the proposed class.

### 2. Commonality

The commonality requirement under Rule 23(a) requires a plaintiff to show that "there are questions of law or fact common to the class." To establish commonality, the party seeking certification must "demonstrate that the class members

have suffered the same injury" and that their claims "depend upon a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (internal quotation marks omitted). "That common contention, moreover must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Factual differences among class members will not necessarily preclude certification 'if the class members share the same legal theory.'" *Stanley*, 891 F.Supp.2d 757, 770 (D.Md. 2012) (*quoting Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D.Md. 2006)).

The Fourth Circuit explained in *EQT Production Co.*, 764 F.3d at 360:

> Although the rule speaks in terms of common questions, "what matters to class certification . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S.Ct. at 2551 (internal quotation marks omitted). A single common question will suffice, *id.* at 2556, but it must be of such a nature that its determination "will resolve an issue that is central to the validity of each one of the claims in one stroke," *id.* at 2551.

(emphasis in original). Here, as framed by Plaintiffs' proposed class, there is no single question – legal or factual – that will generate a common answer as to all of the class members

because whether Defendant violated the notice requirements of the ECOA turns on individual fact-intensive inquiries as to when a *complete* loan modification application was received for each class member, what correspondence Defendant sent in response, and when.  Plaintiffs assert that "[o]ne question common to all members of the proposed class is: when does the clock start on the deadline [for when written notice] must be given" pursuant to Section 1691(d)(1).  (ECF No. 60, at 16).  This question will not generate a *common answer*, however, because, as explained above, Wells Fargo would have to undertake individualized reviews of loan files to determine when loan modification applications were received, whether they were complete or incomplete, what correspondence Defendant sent to each applicant, and whether Defendant violated the notice provisions of the ECOA.  Plaintiffs contend that another common question is whether the notice needs to be in writing, but again, that involves a fact-intensive inquiry depending on whether the loan modification application was complete or incomplete.  Plaintiffs also assert that another common question relates to punitive damages, but that assumes that liability can be established for each class member based on common answers. Defendant's liability will vary widely depending on the factual circumstances surrounding each loan modification application.

Based on the foregoing, Plaintiffs have not met their burden under Rule 23(a).  If a movant fails to meet any of Rule 23(a)'s requirements, analysis under Rule 23(b) is unnecessary. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 n.3 (4th Cir. 1998).  The court will briefly analyze Plaintiffs' claims under Rule 23(b) as well.

### 3. Rule 23(b)

Plaintiffs contend that the facts here are sufficient to support certification under Rule 23(b)(1) or (b)(3).

### a.   Rule 23(b)(1)

Rule 23(b)(1) permits a class action to be maintained only if it can be concluded that:

> prosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; *or*
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Thus, subsection A seeks to avoid possible prejudice to the defendants, while subsection B attempts to eliminate prejudice to the putative class members.

44

Plaintiffs contend that:

> Requiring individual claims could create incompatible standards of conduct for Wells Fargo. For instance, one court might grant an individual plaintiff injunctive relief requiring Wells Fargo to do X while another court may rule that doing X violates the ECOA. Individual litigation could result in inconsistent interpretations of ECOA's requirements leaving Wells Fargo unsure what its obligations are under the ECOA or what triggers those obligations[.]

(ECF No. 51, at 14). Defendant does *not* argue that if the class is not certified, it will be subject to inconsistent adjudications with respect to varying class members. Instead, Defendant believes that there is no risk that lesser or "incompatible standards of conduct" will be established through other litigation, citing to the Consent Judgment entered against Wells Fargo in the District of Columbia, with which Wells Fargo allegedly has complied. (ECF No. 55, at 45). Moreover, Defendant contends that whether it violated the ECOA as to each class member will require a fact-intensive, individualized inquiry, making class action an inappropriate mechanism to adjudicate the ECOA claims here. *See, e.g, Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir. 1986) (finding Rule 23(b)(1)(A) inapplicable because defendants did not argue that they would be prejudiced if the class was not certified). Rule 23(b)(1)(A) is not the proper basis for class certification.

Plaintiffs also have not established that certification under Rule 23(b)(1)(B) would be appropriate. They provide no evidence (or argument for that matter) that adjudication with respect to individual class members practically would be dispositive of the interests of those outside the class or substantially would impair the ability of non-members to assert violations under the ECOA. Plaintiffs broadly state in their memorandum in support of class certification that "Wells Fargo acted identically towards all class members; it failed to comply with the ECOA's requirements," (ECF No. 51, at 13), but whether Wells Fargo violated the notice provisions of the ECOA and its implementing regulations involves a fact-intensive inquiry as demonstrated above. Defendant argues in its opposition that Plaintiffs have offered nothing to demonstrate the applicability of Rule 23(b)(1)(B), and, indeed, other plaintiffs have asserted similar claims against Wells Fargo. (ECF No. 55, at 45-46); *see James Dempsey v. Wells Fargo Bank*, Case No. 13-cv-1363-CCB.[5] Plaintiffs appear to concede that certification under Rule 23(b)(1)(B) is inappropriate, as they state in the reply memorandum that the two requirements in Rule 23(b)(1) are "disjunctive and a plaintiff need only meet one of them," and

---

[5] Plaintiff in *Dempsey* has since filed a stipulation of dismissal.

that "[t]he Piotrowskis meet Rule 23(b)(1)(A)'s requirement."
(ECF No. 60, at 19).

Based on the foregoing, certification under Rule 23(b)(1)
would be improper.

### b.   Rule 23(b)(3)

The Fourth Circuit recently explained the requirements of
Rule 23(b)(3) in *EQT Production Co.*, 764 F.3d at 357:

> [C]ertification under Rule 23(b)(3) is
> appropriate when all of the prerequisites of
> Rule 23(a) are satisfied and two other
> requirements are met. . . .   Specifically,
> (1) common questions of law or fact must
> predominate over any questions affecting
> only individual class members; and (2)
> proceeding as a class must be superior to
> other available methods of litigation.   See
> Fed.R.Civ.P. 23(b)(3).

### i. Predominance

The predominance inquiry focuses on whether liability
issues are subject to class-wide proof or require individualized
and fact-intensive determinations.   *Cuthie v. Fleet Reserve
Ass'n*, 743 F.Supp.2d 486, 499 (D.Md. 2010).   Deciding whether
common questions predominate over individual ones involves a
qualitative, rather than quantitative, inquiry.   *Gunnells v.
Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003).   The
predominance requirement was recently analyzed in *Soutter v.
Equifax Info Servs., LLC*, ---F.R.D.----, 2015 WL 1787236, at *25
(E.D.Va. Apr. 15, 2015):

Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements in Rule 23(a)." *Ealy* [*v. Pinkerton Government Services, Inc.*], 514 Fed.Appx. [299,] 305 [4th Cir. 2013] (*citing Wal-Mart*, 131 S.Ct. at 2556). This requirement is "even more demanding than Rule 23(a)," *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013), and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," Amchem, 521 U.S. at 623. This is not simply a matter of counting common versus noncommon questions and checking the final tally. "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock* [*v. Weis Markets, Inc.*], 385 Fed.Appx. [267,] 272 [4th Cir. 2010] (*citing Gunnells*, 348 F.3d at 429). In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." *Newberg* § 327.

"In order to meet the predominance prong of Rule 23(b)(3), a plaintiff must 'demonstrate that the element[s] of [the legal claim] [are] capable of proof at trial through evidence that is common to the class rather than individual.'" *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 340 (D.Md. 2012) (*quoting In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)). "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, . . . a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues

predominate in a given case." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (internal quotations omitted).

Plaintiffs attempt to show that common questions will predominate because Wells Fargo dealt uniformly with all loan modification applicants:

> Wells Fargo had the same policy and practice when reviewing the applications submitted by all proposed class members: an application is not complete until the Underwriter subjectively determines that it is and thus notice is not required until 30 days after the Underwriter's decision. Wells Fargo stakes virtually its entire defense against liability on the propriety of this policy and practice. This will be the determinative issue for liability and predominates over any individual issue.

(ECF No. 60, at 21). As explained above, however, whether a loan modification application was complete and what subsequent correspondence followed from Wells Fargo will be a fact-intensive individualize inquiry. Wells Fargo's liability as to each class member for violating the distinct notice provisions of the ECOA will vary depending on what information was regularly obtained to make the application complete during the applicable time frame (two years preceding this action as defined by Plaintiffs), what, if any, correspondence Wells Fargo sent, and when. In some instances, the application may have been complete at the time it was forwarded from the Home Preservation Specialist to an Underwriter and no further

information was required.   In other instances, however,
additional information may have been required from the applicant
to complete the application and enable Wells Fargo to inform the
applicant of any action on the application in accordance with
Section 1691(d)(1).   As stated above, Plaintiffs' attempt to
establish Wells Fargo's liability for violating the notice
provisions of the ECOA erroneously relies on a "one size fits
all" approach for compliance with the ECOA.   The analysis
undertaken by the Fourth Circuit in *EQT Production Co.*, 764 F.3d
at 366, is instructive:

> But the mere fact that the defendants
> engaged in uniform conduct is not, by
> itself, sufficient to satisfy Rule
> 23(b)(3)'s more demanding predominance
> requirement.   The predominance inquiry
> focuses not only on the existence of common
> questions, but also on how those questions
> relate to the controversy at the heart of
> the litigation.  *See Amchem Prods.*, 521 U.S.
> at 623 (noting that the predominance inquiry
> "trains on the legal or factual questions
> that qualify each class member's case as a
> genuine controversy").   Even a plethora of
> identical practices will not satisfy the
> predominance requirement if the defendants'
> common conduct has little bearing on the
> central issue in the litigation – in this
> case, whether the defendants underpaid
> royalties.   Absent such a relationship,
> there is no basis for concluding that
> individual issues will not predominate.

*See also Gresser v. Wells Fargo Bank, N.A.*, Civ. No. CCB-12-987,
2014 WL 1320092, at *6 (D.Md. Mar. 31, 2014) ("Although
determining whether Wells Fargo breached the contract and caused

KH's losses is a class-wide inquiry, its liability to some class members requires individualized inquiries into whether those class members waived, or are estopped from bringing their claims.").

Moreover, Plaintiffs generalize the requirements under the ECOA, without specifying the acts that trigger certain obligations from creditors. For instance, Plaintiffs argue that all class members suffered a common injury:

> All members of the class had a right to receive written notice within 30 days of submitting their applications; Wells Fargo uniformly violated that right. Accordingly, Plaintiffs and members of the class share a common question of liability: whether Wells Fargo violated the ECOA by failing to provide class members with written notice within 30 days of receiving a loan modification application.

(ECF No. 51, at 16). Different obligations under the ECOA and its implementing regulations are triggered depending on whether an application is complete or incomplete and the clock does not necessarily begin to run when the loan modification application first is *submitted*. Notice of incompleteness may be provided orally initially and the thirty-day requirement to provide notice of any action taken by the creditor applies after a *completed* application is submitted. Accordingly, Plaintiffs improperly generalize and/or conflate the requirements of the ECOA and base their arguments that common questions predominate

on these overgeneralizations.    Plaintiffs' additional argument

regarding common questions concerning Wells Fargo's purported

violations  of  Section  1691(d)(2)  similarly  is  flawed.

Plaintiffs contend that:

> In many cases, Wells Fargo's failure to
> review  and  decide  on  an  application
> constituted  a  *de  facto*  denial  of  that
> application  which  required  a  specific
> statement  of  reasons  for  the  denial.   Wells
> Fargo  did  not  provide  many  borrowers  with
> that  statement  of  reasons  in  violation  of
> the  ECOA.   Proof  of  Wells  Fargo's  failure  to
> implement  the  proper  procedures  and
> implementation  of  an  improper  policy  are
> subject  to  common  proof.

(ECF No. 51, at 16).   As explained above, in some instances,

however, a statement of reasons may be provided orally if the

written notification advises the applicant of his right to a

statement of reasons.    Whether Wells Fargo violated Section

1691(d)(2) by failing to provide a statement of reasons (orally

or in writing) also is subject to individualized proof.   *See,*

*e.g., Gresser*, 2014 WL 1320092, at *8 ("[D]etermining Wells

Fargo's liability to all class members would only begin with

common evidence as to breach, but would quickly require many

mini-trials as to whether any class members could actually

recover.  Certification is improper in such a case.").

Based on the foregoing, Plaintiffs have not established

that common questions of law or fact predominate over individual

ones.

**ii. Superiority**

With respect to the superiority prong of Rule 23(b)(3), four factors generally should be considered:

> (i) the strength of the individual class members' interest in controlling the prosecution and defense of a separate action, (ii) the extent and nature of existing litigation already begun by or against class members, (iii) the desirability or undesirability of concentrating the litigation in the single forum selected by the class plaintiffs, and (iv) the likely difficulties in managing the class action.

*Lloyd v. Gen. Motors Corp.*, 275 F.R.D. 224, 228 (D.Md. 2011).

The Fourth Circuit explained in *Stillmock*, 385 F.App'x at 274:

> Although a determination of superiority necessarily depends greatly on the circumstances surrounding each case, some generalizations can be made about the kinds of factors the courts will consider in evaluating this portion of Rule 23(b)(3).
>
> The rule requires the court to find that the objectives of the class-action procedure really will be achieved in the particular case. In determining whether the answer to this inquiry is to be affirmative, the court initially must consider what other procedures, if any, exist for disposing of the dispute before it. The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court.

(*quoting* 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3$^d$ ed. 2005)).

Plaintiffs argue that an individual plaintiff would not have the resources or incentives to pursue his or her claims individually, and "[g]iven the common questions of liability and damages, litigating this case as a class action serves to conserve the resources of the judiciary and the parties by preventing the same issues from having to be litigated over and over in individual lawsuits." (ECF No. 51, at 18). Plaintiffs acknowledge that two other cases have been brought in the District of Maryland alleging similar violations, but contend that the instant litigation predates those cases and "should the Court certify a class in the instant class, the plaintiffs in the other two lawsuits would be free to opt out and continue to pursue their individual lawsuits against Wells Fargo." (*Id.* at 19). Both cases that Plaintiffs cite have been terminated, however. The two cases are *Kaswell v. Wells Fargo Bank, N.A.*, Case. No. 13-cv-02315-RDB, and *Walton v. Wells Fargo Bank, N.A.*, Case No. 13-cv-00428-AW. In *Kaswell*, Judge Bennett granted plaintiff's stipulation of dismissal. In *Walton*, Judge Williams issued an order dismissing the case due to plaintiff's failure to file an amended complaint.

On balance, class certification is not a superior method to adjudicating the highly individualized questions of whether

Wells Fargo violated the notice provisions of the ECOA during the specific time frame, as defined by Plaintiffs, depending on whether a complete or incomplete application was received, what correspondence followed from Wells Fargo, and when. The type of claims at issue here are best suited for individual treatment. As the record makes clear, even determining whether the borrower's loan modification application was complete (or incomplete), let alone ascertaining what Wells Fargo communicated to the applicant and when, would entail "a review of servicing notes, imaged files, correspondence logs, and differing investor standards for each class member's loan." (ECF No. 55, at 50). There would be significant manageability problems with this case due to the predominance of individual issues. *See, e.g, Zimmerman*, 800 F.2d at 390 ("When individual rather than common issues predominate, the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." (*quoting* 7A Wright & Miller, Federal Practice and Procedure § 1778 at 56)); *Gresser*, 2014 WL 1320092, at *9 ("Wells Fargo's liability to any individual Noteholder turns not just on breach, but on whether or not a class member waived or can be estopped from bringing a breach of contract claim. Breach would only begin the inquiry, therefore, into Wells Fargo's liability to any single class member. For that reason, liability issues are

not resolvable on a class-wide basis such that a clear divide between common and individual issues can be made along the divide between liability and damages."). Plaintiffs also have failed to satisfy the two prongs of Rule 23(b)(3).

Based on the foregoing, Plaintiffs' motion for class certification will be denied.

**B.  Motions to Seal**

The standard for sealing was set forth in the March 19, 2015 memorandum opinion and need not be repeated. (ECF No. 57). The parties have submitted renewed motions to seal portions of their motion papers and exhibits in connection with Plaintiffs' motion for class certification. (*See* ECF Nos. 58, 59, 61).

**1.  Wells Fargo's Motion to Seal its Opposition and Accompanying Exhibits (ECF No. 58)**

Defendant has filed on the public docket redacted versions of its opposition memorandum and five of the exhibits, which include minimal redactions on the basis that these filings contain proprietary financial information, specifically Wells Fargo's database codes. (*See* ECF Nos. 58 through 58-6, proposed redacted filings); *see, e.g, Pittston Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004) (affirming decision to seal certain "confidential, proprietary, commercial, or financial data" that was produced under a protective order). Defendant also seeks to redact those portions of deposition testimony provided by

Plaintiffs which discuss confidential income and payment information relating to their mortgage loan. Having reviewed the documents, Wells Fargo's proposed redactions are minimal and will be accepted.

Defendant also requests that the following seven exhibits remain fully sealed: ECF Nos. 55-13[6]; 55-14; 55-16; 55-17; 55-18; 55-19; and 55-20. Defendant represents that these filings contain details regarding the loss mitigation history of specific borrowers' loan, payment information related to mortgage loans, account activity statements, documents and servicing notes from the borrower's loan file, and are replete with personal financial information relating to the borrower's loan. (ECF No. 58, at 4). Based on an independent review, the court agrees that these filings contain confidential financial data and should remain under seal. The remaining exhibits will be unsealed.

## 2.   Plaintiffs' Motion to Seal (ECF No. 59)

Plaintiffs have provided redacted versions of Exhibits 4, 5, 6, 8, and 9 to their motion for class certification. Plaintiffs represent that these exhibits contain information relating to third party borrowers, such as proprietary codes, loan numbers, and details of the loss mitigation history of

---

[6] ECF No. 55-13 exceeds 100 pages and was filed in hard copy with the Clerk's Office.

certain borrower loans which Wells Fargo provided in discovery. Based on an independent review, the redacted portions of these filings refer either to Wells Fargo's database codes or to borrowers' financial account information related to loan modification applications.  The redacted versions have been filed on the public docket, (ECF Nos. 59-1 through 59-5), are minimal, and will be accepted.  Plaintiffs indicate that they submitted a redacted version of Exhibit 3, but it does not appear that they have.  Accordingly, they should file promptly a redacted version of this exhibit on the public record.

The remaining exhibits will be unsealed.  The complication is that Plaintiffs have filed *all* of their exhibits to their initial motion to certify in bulk as one exhibit.  Accordingly, Plaintiffs must file promptly on the public docket fully unredacted versions of the following exhibits: Exhibits 1, 2, 7, 10, 11, and 12.  The clerk will be directed to unseal their memorandum in support of the motion for class certification.

### 3. Plaintiffs' Motion to Seal Reply Memorandum and Accompanying Exhibits (ECF No. 61)

Plaintiffs have submitted on the public record redacted versions of their reply memorandum and the four accompanying exhibits.  (*See* ECF No. 61-1 and 61-2).  The redacted portions of these filings contain Wells Fargo's database codes and loan numbers which reflect confidential consumer information.  Upon

an independent review, the redactions are minimal and justified, and will be accepted.  The unredacted versions of these filings will remain under seal.

### 4. Memorandum Opinion

The undersigned will not endeavor to determine what portions (if any) of this Memorandum Opinion contain information that is under seal.  Rather, the Memorandum Opinion will be filed under seal temporarily, and the parties are directed to review it and within fourteen (14) days suggest *jointly* any necessary redactions that should be made before it is released to the public docket.

### III. Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification will be denied.  The motions to seal will be granted.  A separate order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
